JOHN A. GLICK *v.* SEUFERT CONSTRUCTION AND SUPPLY CO. INC.

[No. 1-675A104. Filed March 10, 1976.]

*F. Jefferson Crump, III, Jewell, Crump & Angermeier,* of Columbus, for appellant.

*John S. Chappell,* of Jasper, for appellee.

ROBERTSON, C.J.—Plaintiff-appellant, Glick, brings this appeal from a negative judgment entered on his complaint against defendant-appellee, Seufert, for the recovery of the reasonable value of services rendered on a construction project.

The sole issue upon appeal is whether the trial court's judgment is contrary to law.

This case arises out of the construction of a convalescent care center in Hope, Indiana, undertaken by Seufert Construction Co. (Seufert), the legal owner of the real estate and general contractor, for Harold Chandler, the contract purchaser and present operator of the center. As the general contractor, Seufert engaged various subcontractors including Glick, an experienced local contractor, and Patoka Valley Plumbing and Heating Co. Glick was hired directly by Seufert for several portions of the construction including digging footings and hauling rock, while Patoka was engaged as the subcontractor for the installation of the plumbing and heating equipment on the project. Glick was also hired by Patoka for portions of work it had contracted to do.

Problems developed in the middle of January of 1973. (The evidence is in conflict as to what actually occurred during this period.)

Patoka contracted with Glick to complete the plumbing work on the project. Glick claimed that he had heard that Patoka was ordered off the job, so he ceased work. At this time Glick met with Chandler and Jim Lienenbach, Seufert's construction superintendent. According to Glick, the three recognized that Patoka had discontinued its plumbing work, that large portions of the work had been done incorrectly, and

that because of these facts the finish work on the entire project was being delayed well beyond the scheduled completion date.

Leinenbach asked Glick to finish the plumbing work, acknowledging that it would not get done otherwise. Glick refused to continue until he knew who would pay him. Leinenbach told him to go ahead and that he would "try to help him get his money." Upon that assurance, Glick proceeded to finish the heating and plumbing work on the project, which involved the correction of much of the work previously undertaken by Patoka.

Seufert claims that Glick's only agreement was with Patoka, who was in fact, never dismissed from the job. Seufert contends that it did not object to the arrangement and even went so far as to tell Glick that Seufert would attempt to see that Patoka paid Glick for his work. According to Wayne Seufert, the company president, this meant only that Seufert would apply pressure to Patoka by withholding contract payments, and was not an express promise to directly compensate Glick.

Glick proceeded to finish and correct the plumbing work, and Leinenbach inspected the site weekly from the middle of January until the first part of May when the project was completed. Glick stated that during those inspections he checked with Leinenbach on problems that had arisen and was told to go ahead and fix those problems brought to Leinenbach's attention. Wayne Seufert visited the site on two occasions during this period and commented to Glick that he was doing a good job and urged him to finish his work as soon as possible.

Glick finished most of his work around the first of April and on April 7, 1973, sent a statement in the amount of $5,528.14 to Patoka. About three months later, payment had not been received despite several further notices. Glick then sent a copy of the statement to Seufert and requested payment. Wayne Seufert responded that Glick had failed to

promptly notify Seufert of Patoka's nonpayment and that as a result Seufert had paid Patoka in full under the terms of the contract. Seufert stated that he was now powerless to help Glick obtain his money from Patoka. Despite Seufert's objection, Glick continued to send several notices to Seufert demanding payment for the work performed.

Finally, on February 25, 1974, Glick filed suit against Seufert and Patoka. Both were served and appearances were entered for each. A default judgment was entered against Patoka on October 16, 1974. Seufert filed its answer in general denial of the complaint and trial was set for November 22, 1974. On December 19, 1974, the trial court entered judgment against Glick and in favor of Seufert.

Glick brings this appeal contending that the judgment is contrary to law.

Glick acknowledges that our standard of review of a negative judgment places a heavy burden upon a plaintiff-appellant seeking a reversal.

"The standard of review which limits our consideration of this issue is well established. It is only where the evidence is without conflict and can lead to but one conclusion, and the trial court has reached an opposite conclusion, that the decision of the trial court will be set aside on the ground that it is contrary to law. *Pokraka* v. *Lummus Co.* (1951), 230 Ind. 523, 104 N.E.2d 669". *Lamb* v. *Conder* (1975), 166 Ind. App. 293, 335 N.E.2d 625.

Glick contends that the judgment is contrary to law in that the evidence is without conflict and leads only to the conclusion that he should recover against Seufert on either of two theories; account stated or quantum meruit.

Glick first argues that the evidence establishes as a matter of law that an account was stated between Glick and Seufert in the amount of $5,528.14.

An account stated is defined as an agreement that items of account and the balance struck are correct, together with a

promise, express or implied, to pay the balance. *Walsh* v. *Fulton County Farm Bureau Coop. Assoc.* (1969), 146 Ind. App. 42, 252 N.E.2d 609; 1 I.L.E., Accounts and Accounting §§ 31, 32, p. 60.

"The general rule on an account stated, is that there must have been:

'. . . prior dealings between the parties, and after an examination of all the items by each of the parties, they must have mutually agreed upon the items of the account, and that the balance struck is just and due from the party against whom it is stated.' *Bosson* v. *Brash* (1916), 63 Ind. App. 86, at p. 89, 114 N.E. 6 at p. 7." *Bottema* v. *Hendricks County Farm Bureau Coop. Ass'n, Inc.* (1974), 159 Ind. App. 175, 306 N.E.2d 128, 130.

Glick correctly asserts that while an account stated requires an agreement that the items of account and the balance are correct, the agreement may be inferred from delivery of the statement and the recipient's failure to object within a reasonable time. *First National Bank of Tipton* v. *Peck* (1913), 180 Ind. 649, 103 N.E. 643; *Burns Construction, Inc.* v. *Valley Concrete* (1975), 163 Ind. App. 154, 322 N.E.2d 404.

However, the record in the present case discloses that Seufert did make objection to the first statement which he received from Glick, and once an objection is made to an account, further objection to subsequently received statements is not required. *Walsh* v. *Fulton County Farm Bureau Coop. Assoc.*, *supra; Jasper Corporation* v. *Manufacturers' Appraisal Co.* (1972), 153 Ind. App. 457, 287 N.E.2d 781.

Furthermore, Seufert defended the entire suit upon the basis that there was never any agreement between Sufert and Glick. If that were true, it is doubtful that Seufert could be burdened with the duty to object to the statement of account to prevent being bound thereon. In other words, if there was never an agreement between the two parties, one party may not submit a bill to another and upon that party's

failure to object, sue for the amount stated since there would be no duty to object to the statement of account.

At any rate, the evidence did not lead *only* to the conclusion that Glick should recover upon the theory of an account stated.

Glick next argues that the evidence establishes as a matter of law that he should recover for the reasonable value of his work on a theory of quasi-contract or quantum meruit.

"Contracts implied in law, more properly termed constructive or quasi contracts, are not contracts in the true sense. They rest on a legal fiction imposed by law without regard to assent of the parties. They arise from reason, law, and natural equity, and are clothed with the semblance of contract for the purpose of remedy." *Dyer Construction Co., Inc.* v. *Ellas Const. Co., Inc.* (1972), 153 Ind. App. 304, 308, 287 N.E.2d 262, 264.

To recover upon the basis of quasi-contract, the plaintiff must show that a benefit was rendered to the defendant at his implied request under circumstances in which equity demands that the defendant compensate the plaintiff therefor in order to prevent unjust enrichment. *Kody Engineering Co., Inc.* v. *Fox & Fox Ins. Agency, Inc.* (1973), 158 Ind. App. 498, 303 N.E.2d 307.

The basic element of the quasi-contract cause of action is the unjust enrichment of one party at the expense of another. While Seufert received the benefit of Glick's plumbing work, it is difficult to see how that benefit constituted *unjust enrichment* on the facts of this case.

In the first place, the evidence shows that Seufert did pay for the plumbing work. It paid Patoka with whom it had contracted to do the work and to whom it was bound to make the payment upon the work's completion. Moreover, Glick should have realized that Seufert did not intend to be obligated to pay him for the work in light of the equivocal statement, "we will help you get your money."

Thus, the evidence does not lead only to the conclusion that a quasi-contract recovery should be granted.

Judgment affirmed.

Lowdermilk, J., concurs; Lybrook, J., dissents with opinion.

### DISSENTING OPINION

LYBROOK, J.—Having examined the record of the proceedings below at length, I must respectfully dissent from the decision of my colleagues. In my opinion, the essential evidence is without conflict and leads but to one reasonable conclusion, that being that Seufert Construction and Supply Co. is responsible to Glick on the theory of quasi-contract.

The undisputed evidence reveals that Patoka Valley Plumbing and Heating Co. was, for reasons not disclosed, experiencing considerable difficulty in its attempt to fulfill its obligations under its contract with Seufert. For that reason, Patoka Valley contacted Glick sometime in January, 1973, and apparently made arrangements for Glick to finish the plumbing work. There is, however, no evidence that an express written contract existed between Patoka Valley and Glick. Moreover, subsequent to the apparent agreement between Patoka Valley and Glick and upon learning that Patoka Valley had completely ceased any and all work on the Hope Convalescent Center, Glick also ceased all work on the plumbing. It was at this time that Glick approached Leinenbach, the general superintendent of Seufert, and in the presence of Chandler, notified Leinenbach that all plumbing work on Glick's part had ceased "until I find out who is going to pay me . . .". At this point, Glick was told by Leinenbach to go back to work and that he would see to it that Glick was paid. As appellee points out there is somewhat of a dispute in the evidence as to Leinenbach's exact statement. There were three persons at this meeting, Glick, Leinenbach and Chandler. Glick's testimony was:

"And so Jim [Leinenbach] told me that, to go to work, and that they [Seufert] would see that I got paid."

Leinenbach testified that his statement was:

". . . he [Glick] agreed that he would go ahead and do the work, and I told Mr. Glick that I would try to help him get his money . . ."

Chandler's testimony concerning the incident was:

"When he [Glick] asked if he would get paid, and who was going to pay him, and I was standing there, and Mr. Leinenbach said 'we will see that you get paid.'"

In my opinion, the only *reasonable* conclusion that may be drawn from Leinenbach's statement to Glick, considering the circumstances under which the conversation occurred, is that Leinenbach on behalf of Seufert agreed to pay the reasonable value of Glick's services in exchange for Glick's return to work. It is entirely unreasonable to assume that either Glick or Seufert expected that the plumbing work done by Glick was to be done on a gratuitous basis. Clearly from Glick's action in refusing to continue work after Patoka Valley's departure, Seufert was put on notice that Glick would be looking to Seufert for payment. By telling Glick to return to work under assurances of payment, Seufert became bound on a theory of quasi-contract to compensate Glick for the reasonable value of his services.

Additional undisputed evidence which requires the conclusion that a quasi-contractual relationship existed between Glick and Seufert concerns certain materials which were necessary to complete the plumbing work. When approached by Glick concerning these materials, Leinenbach stated:

". . . buy them, pay for them and send a paid receipt to Seufert Construction Company."

Moreover, upon completion of the nursing home, Glick in a conversation with Mr. Seufert, inquired as to when he [Glick] could expect payment. Seufert replied "in two weeks." Additionally upon completion of the nursing home, Glick was

handed the plumbing "scratch sheet" and requested to correct the defects or deficiencies therein noted. Also, upon completion of the nursing home, Mr. Seufert approached Glick and asked Glick to "take care of his [Seufert's] yearly guarantee" on the home, explaining that Seufert had furnished the purchaser [Chandler] a one year guarantee.

In light of the above evidence, none of which is conflicting or disputed, there is but one reasonable conclusion, that being that a quasi-contractual relationship existed between Seufert and Glick. The majority rejects the quasi-contract theory on the basis that no unjust enrichment was shown for the reason that Seufert allegedly paid Patoka Valley. However, the record does not disclose that Seufert paid Patoka Valley for the work performed by Glick. Rather, the testimony was that Patoka Valley was paid by Seufert for the work they performed. Moreover, if Seufert made any payments to Patoka Valley after Patoka Valley had left the job site and after Glick had notified Seufert that he would look to Seufert for payment, those payments were improperly paid and cannot be used by Seufert as a bar to Glick's claim. For that reason the question of unjust enrichment in this case must be determined as between Glick and Seufert alone without regard to the question of whether Seufert paid a third party for the work Glick performed. For these reasons I would hold Seufert liable to Glick on a theory of quasi-contract. A contrary ruling in my opinion cannot be supported on any reasonable basis in light of the uncontradicted evidence.

While it is true that Seufert and Glick made no specific agreement as to the amount of compensation due Glick, the undisputed evidence is that Glick's statement for $5,528.14 is a fair and reasonable amount for the services rendered. I therefore would reverse the judgment below and remand the case with instructions to enter judgment in favor of Glick in the amount of $5,528.14.

NOTE.—Reported at 342 N.E.2d 874.