William J. BRIGGS, as Conservator, and Individually, Appellant (Defendant Below),

v.

CLINTON COUNTY BANK & TRUST CO. OF FRANKFORT, INDIANA, as Special Administrator of the Estate of Mary Bernice Smoker, Deceased, substituted party, Appellee (Plaintiff Below).

No. 2-581A150.

Court of Appeals of Indiana, Second District.

Aug. 9, 1983.

Rehearing Denied Sept. 14, 1983.

Florence Anne Briggs, Flora, for appellant.

Samuel H. Power, R. Adrian Marks, Frankfort, for appellee.

SULLIVAN, Judge.

William J. Briggs (Briggs) individually and as guardian or conservator of the person and estate of Mary Bernice Smoker, now deceased, (Smoker) appeals the judgment of the trial court on objections to his final report and on claims by both Smoker and Briggs.[1] Smoker died prior to the trial in this cause, and the Clinton County Bank & Trust Co. (the Bank) was substituted as her special administrator.

---

1. Appellant's brief fails to comply with Ind. Rules of Procedure, Appellate Rule 8.3. For instance, Appellant lists issues in the beginning of the brief. However, there is no summary statement of argument as to each issue, nor does he argue his issues in any discernible order. Rather, he sets forth "errors" from his Motion to Correct Error, again in no apparent order, and afterwards argues these errors together, without reference to which issue he refers.

The brief is 345 pages long. It contains extraneous matters, such as affidavits and letters of Briggs and his counsel which were not filed in the trial court. Counsel unduly extends certain arguments and refers to testimony and events not contained in the record before us. The statement of facts is incomplete and misleading.

Nevertheless, we do not consider rebriefing to be a viable solution in this case. Rather, to the extent that we fail to find cogent argument with appropriate citation to authority, Briggs will be found to have waived any claimed error. We feel constrained to admonish Briggs and his counsel for requiring expenditure of judicial time to discern the issues requiring determination.

## FACTS

Briggs was Smoker's personal attorney over a number of years and handled numerous items of business for her. During that time, from approximately 1965 to 1976, he had charged her on only four occasions. In 1965, he charged $7.50 for evicting two of her farm tenants. In 1967, he charged her $41.00 to file a suit and $50.00 to prepare a will. In 1969, he charged $200.00 for handling negotiations with an oil company for a pipeline easement. In 1976, he charged $100.00 to prepare her income tax return.

Until 1976, Briggs had no written legal services agreement with Smoker for the payment of services. He contended that, in 1971, he and Smoker entered into an oral agreement whereby he agreed to perform all legal services for her until her death for the sum of $10,000.00. That agreement was not reduced to writing until November 1976.

In 1970, Smoker executed a will, prepared by Briggs, in which a testamentary trust was created in the residuary clause. The trust provided that the trustees were to choose one or more boys from Carroll County and to pay all college expenses for them from undergraduate through to a professional or doctoral degree. She specified that the first recipient of a scholarship should be the son of Briggs. Briggs' wife, an attorney, was named co-executrix of the will, the Briggses were named co-trustees of the trust, and the Briggses' law firm was designated as attorneys both for the estate and for the trust. The will also contained a $1,000.00 bequest to Briggs.

On November 9, 1976, Smoker executed the following documents, prepared by Briggs, and in the presence of witnesses:

1. A codicil to her will and an affidavit stating that if she ever needed a guardian, she wanted Briggs to act in that capacity;

2. A legal services agreement with Briggs for legal services and "kindnesses" he had rendered to her in the past and those he might render to her until her death, for the sum of $10,000.00. The agreement recited she had already be-

queathed him $1,000.00 in her will, and the other $9,000.00 was to be paid in the form of a certificate of deposit to be issued in their joint names; and

3. A check to the bank for the purchase of the $9,000.00 C.D.

Fifteen days later, on November 24, 1976, Briggs filed a petition for the appointment of a conservator of the person and estate of Smoker. The petition had been prepared by Briggs and signed by Smoker's cousin. The court appointed Briggs as conservator. Smoker was a diabetic and had been hospitalized sometime after November 9, 1976, but before November 24, 1976, because of insulin imbalance. Because of her medical condition, Smoker had had periods of blackouts when she did not know where she was or what she had done.

In November and December, 1976, Smoker's condition worsened. However, in January 1977, her diabetes stabilized and she improved. She had no recollection of the events of November 9, 1976. She disavowed the legal services agreement and was incensed that a conservatorship had been established over her and her property. She consulted with another attorney to see what could be done to have Briggs removed as conservator.

This is but a bare-bones recitation of the facts preceding the litigation in this case. Other facts relating to the issues and the trial of this cause will be referred to, as relevant, under each issue.

Briggs presents issues on appeal with respect to:

I. Allegedly libelous statements in Smoker's Petition to Discharge;

II. The trial court's determination that the legal services contract and certificate of deposit were the result of undue influence;

III. A requirement that recission of the contract and certificate of deposit depends upon prior disaffirmance and return to the status quo;

IV. Entitlement to quantum meruit payment for past legal services;

V. Denial of petitions for change of judge;

VI. Curtailment of cross examination during the deposition of Smoker and premature consideration of deposition;

VII. Denial of Conservator Fees;

VIII. Exclusion of prior testimony of an unavailable witness;

IX. The attorney-client privilege concerning prior wills executed by Smoker;

X. Disallowance of a portion of the costs for duplication of a deposition; and

XI. Newly discovered evidence.

In addition, the Bank, as appellee, seeks to recover the costs of additional transcripts filed by it in this appeal and to recover, as damages, attorney fees for defending the appeal. We consider these matters respectively as Issues XII and XIII.

## I.

### LIBELOUS STATEMENTS IN PETITION TO DISCHARGE CONSERVATOR

Briggs first argues that the trial court erred:

(A) In failing to hear evidence on Smoker's Petition to Discharge him as conservator thus denying Briggs the opportunity to defend himself against allegations therein;

(B) In finding that the Petition to Discharge was absolutely privileged;

(C) In finding against Briggs on his claim alleging libelous statements in documents filed by counsel for Smoker; and

(D) In awarding Briggs only nominal damages for libel contained in certain pleadings filed July 14, 1977.

This issue represents a consolidation of a number of issues on appeal. We have consolidated them because they are related and may be disposed of together.

### (A)

Smoker instituted this action by filing her "Petition to Discharge and Remove Conservator and to Appoint a Successor Conservator" (Petition to Discharge). In the petition, she made various allegations as grounds for Briggs' removal. She also alleged that two doctors had recently examined her and found her to be of sound mind and capable to manage her own affairs, but she did not request termination of the conservatorship.

Thereafter, Briggs filed a "Petition to Court to Determine that Mary Bernice Smoker Is Mentally Sound, Is Legally Competent, and Is Capable of Managing Her Person and Her Estate and Terminate Conservatorship" (Petition to Terminate). In it, he referred to the doctors' reports of Smoker's competency and alleged that Smoker did not want a change of conservator, but wanted no conservator at all.

The trial court ordered a hearing on the Petition to Terminate, stating that if that petition were denied, it would hear the Petition to Discharge. After hearing, the trial court terminated the conservatorship and ordered Briggs to file his final report. After Briggs filed the final report, Smoker filed various objections to it and filed claims against the conservator. Briggs filed claims for libel in the allegations of the Petition to Discharge, for damage to his reputation, and for compensation for past services. Although no hearing was ever had on the Petition to Discharge, substantially all the allegations therein were actually litigated in the trial of Smoker's objections to the final report and the various claims.

■ Briggs argues that it was error for the trial court to hear only his Petition to Terminate and to refuse to require the allegations in the Petition to Discharge to be proved. However, his Petition to Terminate took priority over the Petition to Discharge, and, upon the trial court's determination that the conservatorship should be terminated, the issue whether the conservator should be discharged for cause was moot. Further, as we have noted, substantially all the allegations in the Petition to Discharge were actually litigated in the tri-

al on the objections and the claims. Briggs was not prejudiced by the trial court's refusal to hear the Petition to Discharge.

### (B)

Briggs next argues that the trial court erred in finding that the Petition to Discharge was absolutely privileged and, therefore, not libelous. The gravamen of his argument is that the pleading was not absolutely privileged because the pleader abused the occasion by publishing defamatory words even though the words were not necessary to accomplish the purpose for which any privilege existed. Briggs alleges that because Smoker wanted the conservatorship ended completely, Smoker's counsel had the duty to seek the shortest and most direct way out of the conservatorship, i.e., to file a petition to terminate the conservatorship altogether. Because Smoker chose to file a petition to discharge him for cause, she abused the absolute privilege granted to allegations made in pleadings in a lawsuit and, therefore, Smoker should be held accountable for defamatory statements therein.

■ The prevailing rule is that judges, counsel, parties and witnesses are absolutely privileged to publish defamatory matter in the course of judicial proceedings, with the qualification that the statements must be pertinent and relevant to the case. Stahl v. Kincade (1963) 135 Ind.App. 699, 192 N.E.2d 493. See also 50 Am.Jur.2d Libel & Slander § 231 (1970); Restatement (Second) of Torts §§ 586, 587 (1977). The reason underlying this doctrine is that public interest in the freedom of expression by participants in judicial proceedings, uninhibited by the risk of resultant suits for defamation, is so vital and necessary to the integrity of our judicial system that it must be made paramount to the right of the individual to a legal remedy when he has been wronged. 50 Am.Jur.2d Libel & Slander § 231.

The question of relevancy or pertinency is a question of law. Stahl v. Kincade, supra. The courts favor a liberal rule:

"An allegation to which privilege does not extend must be so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt its irrelevancy and impropriety. In order that matter alleged in a pleading may be privileged, it need not be in every case material to the issues presented by the pleadings, but it must be legitimately related thereto, or so pertinent to the subject of the controversy that it may become the subject of inquiry in the course of the trial. *Irrelevancy is not shown by the fact that it was unnecessary to plead the offending allegation ...* and the fact that the alleged libelous matter was stricken from the pleading as irrelevant has been held not to destroy the privilege ... where it otherwise satisfies the requirement of nontechnical relation to the subject of the controversy." 50 Am. Jur.2d Libel & Slander § 239 (emphasis added).

In *Stahl* the Court of Appeals stated the qualification to the rule of absolute privilege as follows:

"'In order that material alleged in a pleading may be privileged, it need not be in every case material to the issues presented by the pleadings. It must, however, be legitimately related thereto, or so pertinent to the subject of the controversy that it may become the source of inquiry in the course of the trial.'" *Stahl v. Kincade, supra,* 135 Ind.App. at 707–08, 192 N.E.2d at 497, quoting 33 Am.Jur. Libel & Slander § 150 (1941).

*Accord Curry v. Orwig* (1st Dist.1981) Ind. App., 429 N.E.2d 268.

■ In determining what is pertinent, much allowance must be made for the "ardent and excited feelings with which a party may become animated by constantly regarding one side only of a controversy." 50 Am.Jur.2d Libel & Slander § 236.

■ We do not agree with Briggs' contention that because the Petition to Discharge was not necessary to accomplish Smoker's desire to terminate the conservatorship, the petition was not privileged. Smoker and her counsel had a choice of

different routes. They had no duty to consider what was best for Briggs. The Petition to Discharge was filed in accordance with I.C. 29–1–18–25 (Burns Code Ed.1972) and I.C. 29–1–10–6 (Burns Code Ed.1972). Even though Smoker had been found to be mentally competent by two doctors, she was still recuperating from a lengthy, chronic illness. If she suffered relapse, she would have run the risk of having Briggs continue as her conservator.

Moreover, there was evidence of record that counsel for Smoker attempted to meet with Briggs before the Petition to Discharge was filed, but Briggs refused to meet unless Smoker also attended. In addition, although Briggs had more than once offered to resign as conservator, his actions belied his words. The Saturday before the Petition to Discharge was filed, Briggs attempted to assert his authority by asking a friend of Smoker to leave her house and by at first denying permission to Smoker to go to a friend's birthday party.

Lawsuits are not peace conferences. Feelings are often wounded and reputations are sometimes maligned. *Bussewitz v. Wisconsin Teachers' Association* (1925) 188 Wis. 121, 128, 205 N.W. 808, 811, 42 A.L.R. 873, 877. A person who feels he is defamed by a pleading containing arguably privileged matter is not without remedy. He may file a motion to strike "immaterial, impertinent or scandalous matter" under Ind.Rules of Procedure, Trial Rule 12(F). In addition, he may file an action for "wrongful civil proceedings" if the proceedings are terminated in his favor and were initiated without probable cause and for an improper purpose. *Shallenberger v. Scoggins-Tomlinson, Inc.* (2d Dist.1982) Ind.App., 439 N.E.2d 699.

The allegations in the Petition to Discharge were relevant and pertinent to whether Briggs should be discharged for cause. That the Petition was never heard does not destroy the absolute privilege cloaking the allegations therein.

We hold that the trial court did not err in finding that the Petition to Discharge was absolutely privileged.

(C)

■ Briggs argues in his brief that "[a] long series of pleadings creating a virtual paper shower of … vituperative statements against Briggs" were also libelous. Appellant's Brief at 136. However, he makes no specific reference to these "pleadings," much less any argument regarding why these "pleadings," or the allegations therein, were not relevant or pertinent to the issues in the case. In his Motion to Correct Error, he did set forth various allegations from a number of documents filed by Smoker, and he did argue generally that these allegations were defamatory *per se.* However, he did not pursue this matter in his brief. Therefore, he has waived any issue regarding them on appeal. *Sebasty v. Perschke* (3d Dist.1980) Ind.App., 404 N.E.2d 1200.

(D)

Briggs next argues that the trial court erred in awarding him only nominal damages for libel in July 14, 1977 pleadings. Briggs, however, has not included these pleadings in the record of proceedings. Briggs states that, because these pleadings are still *in camera* in the trial court, "and because of this appeal, they have not been transcripted [sic] by Briggs who does not wish to be in the position of publishing them, thereby waiving any rights he might have under them …." Appellant's Reply Brief at 10. Alternatively, he states:

"The Appellant [sic] Court is not being called upon to determine whether the July 14, 1977, pleadings were libelous … and accordingly it was not necessary to include them in the transcript for the Upper Court to read…. The question is how much damage was done to Briggs because the pleadings were determined by Judge Munro to be libelous." Appellant's Reply Brief at 155.

■ Briggs' contentions are fatuous. It is true that a defamed person may consent to the publication of defamatory matter and thus waive the tort. *See Restatement (Second) of Torts* § 583. As noted in Comment d, however, the consent may be

limited to publication to a particular person or at a particular time or for a particular purpose. Just as the so-called pleadings were kept *in camera* in the trial court, so Briggs could have petitioned this Court to hold the "pleadings" *in camera.*

 Nor do we agree with Briggs' contention that the trial judge could not award merely nominal damages here. *See Restatement (Second) of Torts* § 620. As stated in Comment a to that Section:

"Nominal damages are awarded when the insignificant character of the defamatory matter, or the plaintiff's bad character, leads the jury to believe that no substantial harm has been done to his reputation, and there is no proof that serious harm has resulted from the defendant's attack upon the plaintiff's character and reputation."

*See American Fletcher National Bank & Trust Co. v. Flick* (1969) 146 Ind.App. 122, 252 N.E.2d 839.

The award of nominal damages is not contrary to law. We hold the trial court did not err in awarding merely nominal damages.

## II.

## UNDUE INFLUENCE

Briggs argues that the trial court wrongly presumed that the execution of the legal services contract and C.D. was procured through undue influence. He argues that he did not have the ultimate burden of proof, but only the burden of going forward with evidence to show that Smoker was not unduly influenced. He alleges that there was no testimony from any person present at the time of the execution of the employment agreement and the C.D. that he had unduly influenced Smoker. Further, he argues that the trial judge "had to completely disregard the testimony of all persons who were actually present" in order to find that he had unduly influenced Smoker. Appellant's Brief at 184. He argues that the evidence was not conflicting, but pointed to only one conclusion, and that, therefore, he is not asking us to reweigh the evidence.

 The legal services contract and C.D. represent, as Briggs concedes, a purported contract made during the existence of the attorney-client relationship. All transactions between an attorney and his client entered into during their confidential relationship are closely scrutinized by the courts and are regarded with suspicion. 7 Am.Jur.2d *Attorneys at Law* § 249 (1980). Such a contract is presumptively invalid as the product of undue influence. To rebut this presumption, the attorney must show by a preponderance of the evidence that the contract was fair and equitable and that the client freely and voluntarily executed it with full understanding. *Id.* §§ 123, 124, 126, 249. *Accord* 13 *Williston on Contracts* § 1627 at 802 (3d Ed.1970). *See also Sweeney v. Vierbuchen* (1946) 224 Ind. 341, 66 N.E.2d 764; *Blasche v. Himelick* (1965) 140 Ind.App. 255, 210 N.E.2d 378, 211 N.E.2d 197. He must show that he acted in good faith and took no advantage of his client. *Sweeney v. Vierbuchen, supra,* at 347–48, 66 N.E.2d at 766.

 Although Briggs argues that the evidence was not conflicting on whether Smoker was unduly influenced, we find in the record before us insufficient evidence to rebut the presumption of undue influence. At the time of the execution of the instruments, Smoker was afflicted with uncontrolled diabetes and arteriosclerosis. Earl Rodkey, who was present at the signing, testified that Smoker did not converse as much as usual, and that she asked whether her farms would be affected if she signed the agreement. Dr. Wagoner, her personal physician, saw her on November 9, 1976, the day she executed the agreement. He testified that, although she could talk to him very well and seemed alert, she could not remember the date, and she showed signs of senility. Smoker herself recalled very little of what occurred on November 9, 1976. She thought she was in the bank at the time of the signing, although in reality she was in her living room. She had no recollection of seeing any of the people who were there. These facts coupled with the

longstanding relationship of trust and confidence lend rationality to the trial court's determination.

We do not imply that we are weighing the evidence. We hold merely that the trial court did not err as a matter of law in determining that the execution of the legal services contract and the C.D. was procured through undue influence.

### III.

### DISAFFIRMANCE AND RETURN TO STATUS QUO AS CONDITION TO RESCISSION OF CONTRACT

Briggs, citing *Ashmead v. Reynolds* (1981) 127 Ind. 441, 26 N.E. 80, argues that before a party to a voidable contract may be subjected to litigation he must have the opportunity to correct the evil, without cost to him. In that case, our Supreme Court held that it is the act of disaffirmance which destroys a voidable contract, not the proceedings later filed. The Court required something to be said, or some act done, whereby the party holding a voidable contract would be on notice that the other party had disaffirmed. *See also Long v. Williams* (1881) 74 Ind. 115.

The Bank concedes that *Ashmead v. Reynolds, supra,* accurately states the rule that a voidable contract must be disaffirmed before a party holding the contract can be subjected to litigation. It contends, however, that Smoker did disaffirm the contract and certificate of deposit.

The requirement that a party to a voidable contract must disaffirm the contract prior to filing suit or lose his right to sue to rescind the contract may be overly technical. The modern rule does not appear to require disaffirmance prior to filing suit. *See Restatement (Second) of Contracts* §§ 7, 380, 381 (1981). Nevertheless, because the Bank concedes that prior disaffirmance was required, we accept that premise and agree that the contract and certificate of deposit were disaffirmed prior to a claim being made to avoid them.

Briggs claims that the first time he knew Smoker wanted the contract rescinded and the C.D. reformed was on February 14, 1977, when the Petition to Discharge was filed. Therein, Smoker alleged that the C.D. was deposited at a time when she was subject to undue influence. In addition, Smoker alleged in her Petition to Discharge that Briggs had induced her to execute the legal services contract and that she did not owe him $10,000.

In the Petition to Discharge, however, Smoker did not request the court to take any action regarding the contract or the C.D. The first pleading in which Smoker requested the court to take judicial action with respect to them was in her Preliminary Objections to Final Report, filed June 23, 1977. The critical date, prior to which the disaffirmance must have occurred, is therefore June 23, 1977.

 A formal notice is not necessary in order to rescind a contract. *Brown v. Young* (1915) 62 Ind.App. 364, 110 N.E. 562. Any "emphatic act, declaratory of an intention to disaffirm" is sufficient. *Long v. Williams, supra,* 74 Ind. at 119. The allegations in the Petition to Discharge emphatically notified Briggs that Smoker considered the contract and C.D. voidable. As stated by the trial judge, "the conservator had over four months' notice of the ward's disaffirmance before the commencement of judicial proceedings to set the instruments aside." Record at 174.

Briggs further contends that if Smoker wished to rescind the contract, she was required to place him in the *status quo ante. See Potter v. Smith* (1871) 36 Ind. 231; *Brown v. Young, supra,* 110 N.E. 562. Essentially, he argues that because she had accepted his prior services, she was required to pay him or offer to pay for them before she could rescind the voidable legal services contract.

The *Restatement (Second) of Contracts* § 384 provides:

"(1) Except as stated in Subsection (2), a party will not be granted restitution unless

(a) he returns or offers to return, conditional on restitution, any interest in

property that he has received in exchange ... or

(b) the court can assure such return in connection with the relief granted.

(2) The requirement stated in Subsection (1) does not apply to property

. . . .

(b) that either could not from the time of receipt have been returned or has been used or disposed of without knowledge of the grounds for restitution if justice requires that compensation be accepted in its place and the payment of such compensation can be assured. . . . "

■ Quite obviously the legal services for which Briggs makes claim had been performed prior to disaffirmance. They could not be returned or recalled. However, the protective purposes of *Restatement* § 384 could be satisfied by a court order requiring payment to Briggs for the value of past services, if the trial court had concluded that Briggs had not rendered those services gratuitously. Payment of such quantum meruit compensation could be assured because the $9,000 C.D. was in litigation and subject to disposition by court order. Payment or an offer to pay was therefore not a condition precedent to the action for recision. *See Lindsay v. Glass* (1889) 119 Ind. 301, 21 N.E. 897; *Economy Leasing Co., Ltd. v. Wood* (2d Dist.1981) Ind.App., 427 N.E.2d 483; *Grissom v. Moran* (2d Dist. 1973 Opinion on Rehearing) 154 Ind.App. 419, 292 N.E.2d 627.

We hold that the trial court did not err in determining that Smoker had disaffirmed the contract and C.D. prior to bringing the action to rescind and reform them and in concluding that Smoker was not required to make any offer to pay for Briggs' services prior to bringing suit.

## IV.

## QUANTUM MERUIT CLAIM FOR LEGAL SERVICES

In his counterclaim Briggs alleged that over a period of eleven years, from 1965 to 1976, he had performed legal services for Smoker under an oral contract for $10,000. He requested that, should the court set aside the written contract and C.D., he be allowed the sum of $10,000 under that oral contract or in the alternative, he be awarded payment for the reasonable value of those services.

The trial judge ably discussed the evidence relating to the alleged oral contract, much of which has not been furnished us to review:

"THE PURPORTED CONTRACT TO PAY FOR LEGAL SERVICES

When we consider the issue of undue influence as it affects the execution of the contract for attorney fees on November 9, 1976, we cannot consider the events of November 8 and 9 in isolation, but must first review the attorney-client relationship of the parties during the preceding eleven years and the contention of the attorney that long before November 9 they had already entered into an oral contract covering the payment of attorney fees.

Mrs. Smoker first started going to Mr. Briggs with her legal work in 1965, and from then continuously up to the execution of the C.D. and the contract relative thereto, he was and remained her lawyer. During these years he handled for her a very large number of matters, often of minor importance, but nevertheless time-consuming. During this period of eleven years it appears that he received only a few scattered payments, not even beginning to compensate him for the work he did, and that he seldom, if ever, sent bills. . . .

In 1967 Mrs. Smoker made a new will, drawn by Mr. Briggs, in which she left him a legacy of $1,000.00. On June 1, 1968, she again executed a new will in which she also left him $1,000.00. She named him as co-executor of this will and named his law firm to serve as attorneys both for the estate and for the trust created under the residual clause. This trust established a scholarship fund, the first beneficiary of which was to be Mr. Briggs' son. The income of the trust was

to pay the entire cost of his college education, from the freshman year of college clear through a professional or doctor's degree. On February 24, 1970, Mrs. Smoker executed another new will, which retained all these provisions in substantially the same form, except that Mr. Briggs's wife was substituted as co-executor in his stead.

The balance of the evidence is in very sharp conflict. Mr. Briggs testified that Mrs. Smoker in mid-June, 1967, proposed that in future, rather than pay him for his services as they were performed, she should pay him a lump sum which would cover all the legal services he might perform for her for the rest of her life. At that time, according to his testimony, she was nebulous as to the amount of the lump sum payment, and he did not pin her down.

Then, according to his testimony, corroborated by his wife, some time after Mrs. Smoker had made her 1970 will, she telephoned him one night and proposed that the lump sum payment be set at $10,000.00, to be paid at her death, and he agreed to this. Mr. and Mrs. Briggs testified that this conversation probably took place in 1971. Mrs. Smoker flatly denied that any oral agreement for fees was ever entered into. According to her, the only mention of $10,000.00 (prior to November, 1976) was by Mr. Briggs, who, referring to the $1,000.00 bequest she was leaving him, remarked in a joking manner: 'Why don't you give me ten thousand? You will never miss it when you're dead.' He denies that he said this.

In weighing the conflicting stories, I have tried to take into account various features that lend probability or improbability to them.

For one thing, Mr. Briggs's practice of not billing Mrs. Smoker for his service began more than a year before they allegedly agreed on a lump sum payment. As earlier stated, he charged her for the first two services he ever performed for her. After that, most of his services were performed without charge and without billing. The statement of services he filed with the court listed 34 separate items of work performed for her up to mid-June, 1967, when she allegedly proposed to pay him in a lump sum rather than for each piece of work separately. He testified orally that he did a lot of other work for her that did not show up on the statement, and this would appear to be true; the statement for instance does not list the preparation of the 1967 will for which she paid him. This tends to support the theory that from the beginning he was following a policy of performing minor services without charge. It is not unknown for lawyers to follow this policy in order to cultivate the good will of elderly persons of means, expecting to profit later by serving as attorney for the estate after the client dies.

From 1967 to 1971, according to his account, the only agreement they had was that he would be compensated for all his legal work by a lump sum, which he said she left "nebulous." A contract leaving out the most important term is of course not a contract at all, and it should have been clear to any lawyer that Mr. Briggs had no sort of enforceable right under this vague statement. Yet he continued to perform numerous services during this four year period without once charging for any of them with the exception of the fee for the pipeline easement. Since by no conceivable stretch of the imagination were these services being performed under a contract, the only explanation I can see is that Mr. Briggs was continuing in his previous policy of cultivating Mrs. Smoker's good will generally. From 1968 on, he may also have been motivated by gratitude because of the generous provisions in her will for his family.

In 1971, according to his account, Mrs. Smoker finally named a specific figure, $10,000.00, and if the parties did have an oral contract, that was the point at which it came into existence.

Mr. Briggs was an experienced lawyer, and well aware of the dangers both to him and to his client of having an oral

agreement known to no one but themselves. If he had been advising her concerning a contract she was entering into with a third party involving the payment of $10,000.00, it is difficult to believe that he would have advised her not to make a written contract, but to rely upon an oral conversation over the telephone to secure her legal rights. Yet from 1971 to 1976, he made no effort to reduce their purported agreement to writing, and even when it was finally done, on November 9, 1976, he says that it was at her suggestion, not his. If, as he says, she was the one who suggested the whole arrangement, including the $10,000.00 figure, there should have been no reason why he could not have written up the agreement and presented it to her immediately. Yet that was never done. In view of his contention at the trial that Mrs. Smoker had a long-standing reputation in the community for welshing on her obligations, this would have been a rather obvious precaution to take for his own protection as well as hers.

Another unusual feature of the purported contract is the fact that the lawyer had absolutely nothing to do with setting the fee for his services. Normally it is the attorney who first suggests to the client the fee which he feels is fair. He is more familiar with customary charges in the profession and will usually have a more accurate idea than the client of the value of his services. Yet in this case Mr. Briggs testified that he worked for four years on the unenforceable promise of an unspecified 'lump sum', and that thereafter his client picked the sum of $10,000.00 out of the air and he agreed to it.

The conservator's evidence has consistently pictured Mrs. Smoker as a pennypincher, who always tried to get the most for her money. Yet up until 1976, although she supposedly had a contract under which Mr. Briggs was to do all her legal work for a consideration of $10,-000.00, she continued to have her income tax return prepared by some one else at a cost to her of $100.00 per year, and only transferred this work to Mr. Briggs when her other preparer was unable to do the work in 1976. Then, ignoring the alleged contract, she paid Mr. Briggs $100.00 for doing this job, which he, also ignoring the contract, accepted. This behavior casts some doubt on the theory that a contract was in existence.

The principal corroborating evidence of the existence of an oral contract for payment of services is the testimony of both John T. Johnson and Earl Rodkey that at the time of executing the written contract on November 9, Mrs. Smoker spoke of owing Mr. Briggs $10,000.00 in attorney fees. Certainly the existence of a contract can be logically inferred from that. But it can also be logically inferred from this evidence that, even though no contract existed, Mrs. Smoker for some reason erroneously believed that she had an obligation to pay Mr. Briggs for eleven years of legal services which had actually been performed gratuitously. If the ward's contention of undue influence is accepted, the latter inference is quite as logical as the former." Record at 34–39.

The trial judge concluded that no oral contract existed, that no implied contract existed to pay for the services rendered Smoker prior to November 9, 1976, and that the services were rendered gratuitously and thus that fees could not be recovered on a quasi-contractual basis.

■ The trial judge's thoughtful rationale is not before us in the form of findings of fact and conclusions of law. Nevertheless, we may look to his written opinion which clearly sets forth the basis of the decision reached. *Keiser v. Board of Zoning Appeals* (1968) 142 Ind.App. 599, 236 N.E.2d 501. *See also Huff v. Travelers Indemnity Co.* (1977) 266 Ind. 414, 363 N.E.2d 985.

Briggs essentially invites us to reweigh the evidence. We cannot do so. *In re Adoption of Jackson* (1972) 257 Ind. 588, 277 N.E.2d 162; *Travis v. Hall* (3d Dist.1982) Ind.App., 431 N.E.2d 519. Rather, we must view only the evidence most favorable to

the trial court's judgment. *Travis v. Hall, supra.*

■ Smoker denied there ever was any oral agreement to pay Briggs for the services he rendered prior to November 9, 1976. She stated that Briggs had never billed her for the services. The trial court did not err in finding that no oral agreement existed.

■ We agree with the trial court that, even though Mrs. Smoker might have erroneously believed she had an obligation to pay Mr. Briggs for eleven years of service, the services might be found to have been rendered gratuitously. The relationship involved here is one of attorney and client. A contract for legal services is governed by more strict rules than those applicable to a contract between parties on equal footing. 7 Am.Jur.2d *Attorneys at Law* § 121 (1980). An attorney who relies on an oral agreement for payment of legal services should not be surprised if the court refuses to enforce it.

■ Briggs' claim that he is entitled to quantum meruit relief under principles of quasi-contract must also be denied. Quantum meruit recovery is equitable in nature. It is axiomatic that, in order to gain relief in equity, one must have clean hands. 27 Am.Jur.2d *Equity* § 136 (1966). In light of our affirmance of the trial court's determination of undue influence, we must hold that Briggs does not meet this requirement.

■ Briggs also argues that he is entitled to the reasonable value of his services under principles governing contracts implied in fact. Mrs. Smoker asked on numerous occasions how much she owed Briggs for his services. Briggs' responses were, at best, equivocal. As noted by the trial court in its opinion, "When services are performed for years on end without the sending of any bill or statement, the natural inference arising from this fact is that the services are being rendered gratuitously." Record at 42–43. Even in the absence of blood or family relationship, a claimant has the burden to prove an implied contract for payment of services rendered. No payment will be required if at the time of the performance the services were rendered without expectation of pay except for a hope of future reward through the generosity of the recipient. *Walting v. Brown* (1965) 139 Ind.App. 18, 211 N.E.2d 803. The trial court did not err in concluding that no implied-in-fact contract existed.

The trial court awarded Briggs $25.00 for services performed in the brief period between November 9, 1976, when the voidable written contract was executed, and November 24, 1976, when the conservatorship was opened. The court stated that the services were compensable under a quasi-contractual theory.

■ This award cannot be sustained. Quasi-contract is founded in equity. *Dyer Construction Co. v. Ellas Construction Co.* (1972) 153 Ind.App. 304, 287 N.E.2d 262. It is an obligation created by law for reasons of justice. *Restatement (Second) of Contracts* § 4 Comment b.

■ In order to recover in quasi contract, one must demonstrate that a benefit was rendered another upon his implied request and under circumstances in which equity demands compensation to prevent unjust enrichment. *Glick v. Seufert Construction & Supply Co., Inc.* (1st Dist.1976) 168 Ind.App. 354, 342 N.E.2d 874; *Kody Engineering Co., Inc. v. Fox & Fox Insurance Agency, Inc.* (2d Dist.1973) 158 Ind.App. 498, 303 N.E.2d 307. A person may be prevented from obtaining compensation if, in connection with the transaction upon which the claim is based, his conduct has been wrongful. Thus, the clean hands doctrine applies in restitution cases. *See* 27 Am.Jur.2d *Equity* §§ 136 *et seq.* A court of equity will refuse to grant its special relief to a person guilty of seriously wrongful conduct with respect to the transaction in question. 66 Am.Jur.2d *Restitution & Implied Contracts* § 9 (1973).

■ In view of the trial court's finding with respect to Briggs' undue influence of Smoker, its award of $25.00 to Briggs under principles of quasi-contract cannot be sustained. There is no other basis upon which

this award can be sustained. Therefore, the trial court's award of $25.00 to Briggs for his services from November 9, 1976 to November 24, 1976 must be set aside.

## V.

### CHANGE OF JUDGE

Briggs contends that the trial court erred in failing to grant any of his numerous petitions for change of judge. These petitions fall into two categories: ones which, if timely, should have been granted automatically under Ind.Rules of Procedure, Trial Rule 76(1); and petitions for change of judge based on bias and prejudice under Trial Rule 76(8). We deal separately with each category.

### A.

With respect to the motions for "automatic" change of judge, Smoker filed her Petition to Discharge on February 14, 1977. A petition to remove a guardian has been explicitly recognized as a "civil action" entitling the guardian to seek a change of venue from the judge. *State v. LaPorte County Superior Court* (1965) 247 Ind. 137, 211 N.E.2d 612; *Matter of Goetcheus* (1983) Ind.App., 446 N.E.2d 39. Proceedings on objections to a guardian's final report have also been recognized to be "civil actions." *Kney v. Gahimer* (1935) 99 Ind.App. 510, 193 N.E. 394; *Matter of Goetcheus, supra.* Under the Act, a conservatorship is synonymous with a guardianship. See I.C. 29–1–18–1 (Burns Supp.1982).

In the instant case, Briggs filed two motions for "automatic" change of

judge, one on November 27, 1978 and one on October 9, 1979, after Briggs' October 2 reply to Smoker's counterclaim. The timeliness of these motions is governed by Trial Rule 76(3). Thirty days are allowed after the filing of a case within which to request a change of judge when no pleading or answer is required to be filed by the defending party. No pleading or answer is required from a guardian with respect to a petition to remove. *See* I.C. 29–1–10–6 (Burns Code Ed.1972). *See also State ex rel. Harper v. Wheatley* (1963) 244 Ind. 245, 191 N.E.2d 708.

The thirty-day period under T.R. 76(3) expired March 16, 1977. Therefore, both of Briggs' motions for mandatory change of judge were untimely and properly denied.

### B.

As previously noted, Briggs filed a number of petitions for change of judge based upon bias and prejudice. The propriety of these motions is governed by Trial Rule 76(8) [2] and I.C. 34–1–13–1.[3]

Briggs filed his first verified motion for change of judge based on bias and prejudice on December 21, 1978. Although the form and content of Briggs' motion is somewhat imprecise, we distill from it the allegations required under T.R. 76(8) with respect to (1) when the cause was first discovered; (2) how the facts were discovered; (3) the specific facts showing cause; and (4) why the cause was not discovered sooner through the exercise of due diligence (at least with respect to an order of the court on December 4, 1978, which terminated the taking of Smoker's deposition and denied a previous

2. Trial Rule 76(8) provides:
"[I]f the moving party first obtains knowledge of the grounds for change of venue from the county or judge after the time above limited, he may file said application, which must be verified personally by the party himself, specifically alleging when the cause was first discovered, how discovered, the facts showing the grounds for a change, and why such cause could not have been discovered before by the exercise of due diligence. Any opposing party shall have the right to file counter-affidavits on such issue within ten

[10] days, and the ruling of the court may be reviewed only for abuse of discretion."

3. I.C. 34–1–13–1 provides in part:
"The court in term, or the judge thereof in vacation, shall change the venue of any civil action upon the application of either party made upon affidavit showing one or more of the following causes:
\* \* \* \* \* \*
Seventh. When either party shall make and file an affidavit of the bias, prejudice or interest of the judge, before whom the said cause is pending."

motion for change of judge). However, to the extent that the court's order was "the culmination of a series of adverse actions of said Judge establishing a pattern which now clearly demonstrates the hostility, bias and prejudice of Judge Munro . . ." (Record at 349), the required showing of due diligence has not been made. We therefore do not consider matters which occurred prior to December 4, 1978.

When a proper motion for change of judge for cause is presented to the court under Trial Rule 76(8), the trial judge has discretion in ruling on the motion, and his ruling may only be reviewed for an abuse of discretion.

█ Briggs contends that the trial court's adverse ruling on December 4, 1978 shows its bias and prejudice. However, the mere fact that a court's rulings are not favorable cannot be considered as cause for a change of judge. *State ex rel. Grile v. Allen Circuit Court* (1967) 249 Ind. 173, 231 N.E.2d 138; *Kujaca v. Kujaca* (3d Dist. 1973) 159 Ind.App. 6, 304 N.E.2d 870. *Cf. In Re Kesler* (1979) Ind., 397 N.E.2d 574, 576, *cert. denied* (1980) 449 U.S. 829, 101 S.Ct. 96, 66 L.Ed.2d 34 ("If adverse rulings and findings, without additional corroboration, could establish bias or prejudice, this Court would never be able to affirm a determination in any type of review." 397 N.E.2d at 576).

Briggs also contends that the trial court's December 4th ruling terminating the deposition of Smoker without a hearing as he had requested demonstrated bias and prejudice. The determination whether to hold a hearing was within the discretion of the trial court. Trial Rule 73 mandates hearings only upon motions requiring notice and hearing. Trial Rule 30(D), relating to motions for the termination of depositions, does not require a hearing. It simply states,

"[O]n motion of any party . . . and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, the court . . . may order the officer conducting the examination to cease forthwith from taking the deposition . . . ."

*Compare* Trial Rule 37(A)(4) which provides: "If the motion [to compel discovery] is granted, the court shall, after opportunity for hearing, require the party . . . to pay . . . ."

█ Although the requirement for a "showing" of bad faith or oppression in the conduct of discovery indicates contemplation of an evidentiary proceeding, such is not mandated. In the discretion of the court, the requisite showing may be made to appear by affidavit or by matters otherwise of record before the court. Here, as more fully treated under Issue VI, the court did not terminate discovery. It merely ordered that continuation of repetitive cross examination, which had already consumed some sixteen hours be conditioned upon assumption of the costs. Furthermore, Briggs was not denied opportunity to oppose the curtailment of the deposition for he was permitted to and did file a memorandum in response to Smoker's petition to terminate the deposition. We do not deem the trial court's action in this matter indicative of bias or prejudice.

█ Briggs also contends that the fact that no copy of the December 4th order was sent to him or Mrs. Briggs discloses bias and prejudice. A copy of the order was promptly sent to Briggs' co-counsel. In his counter-affidavit, filed January 2, 1979, Smoker's counsel averred:

"[I]t appears that through oversight and inadvertence no copy was mailed to either of the Briggs' [sic] or to R. Adrian Marks [counsel for Smoker]. R. Adrian Marks learned of the order a few days later from his co-counsel, Samuel H. Power, and he received a copy of the order on December 21, 1978, postmarked December 19, 1978." Record at A130.

The fact that Smoker's co-counsel also did not receive prompt notice of the order demonstrates that bias and prejudice was not the basis of the failure to advise, but mere inadvertence. We find no abuse of discre-

tion in the trial court's overruling of the motion for change of judge.

■ Briggs' next motion for change of judge for cause was filed September 24, 1979. This motion was apparently filed pursuant to T.R. 76(8) but was not verified by the party as required by that rule. The grounds alleged in the motion are based on a pleading filed by Smoker on July 14, 1977, over two years before. The motion fails to allege why the grounds could not have been discovered earlier by the exercise of due diligence. The motion for change of judge was therefore properly denied. *See Indianapolis v. L & G Realty & Construction Co.* (1960) 132 Ind.App. 17, 170 N.E.2d 908.

■ On December 3, 1979, the first day of the trial, Briggs made an oral unverified motion for change of judge based on bias and prejudice and supported it by a written memorandum. This motion did not comply with the requirements of T.R. 76(8) and was properly denied.

■ On January 17, 1980, during the trial of the cause, Briggs filed a verified written motion for change of judge based on bias and prejudice. Even though this motion was made during trial, it could not be properly denied simply on that basis. *State ex rel. George v. Dean* (1935) 209 Ind. 276, 198 N.E. 792. In *Thorn v. Silver* (1910) 174 Ind. 504, 511, 89 N.E. 943, 946, our Supreme Court noted:

"True, every party is entitled to an unbiased and unprejudiced trier of fact and of law, and the presumption is of the unbiased and unprejudiced mind of a judge who acts in a cause, but, if on discovery of a condition or a state of facts on a trial which render it manifestly improper for a judge to act the submission should be set aside on his own motion, and the venue changed, or if this is not voluntarily done, a showing made cannot be ignored; but it should be more than the mental conclusion of a party on such an abstract question as bias or prejudice stated in the language of the statute. It could not in reason be required that the application should be made before discovery, and if the discovery of bias or prejudice arises

during trial by a supposed extreme, or adverse ruling, and a party should be so impressed as that he would feel justified in making the affidavit, the progress of the trial courts might be arrested at any stage, and it is useless to argue the evils of such rule. We think the court did not err in refusing a change of venue from the judge under the facts in this case."

■ Likewise, we conclude that the trial court did not abuse its discretion in denying this motion for change of judge. Most of the allegations for cause find fault with the trial judge's rulings. *See Kujaca v. Kujaca, supra,* 304 N.E.2d 870. The memorandum in support of the motion and Briggs' argument in his appellate brief include references to statements of counsel and the trial judge and detail other events for which no transcript references are supplied. It is the appellant's duty to show how the trial court erred and to support allegations with a record which supports the alleged errors and which sufficiently permits an intelligent decision of the issues. *State v. Kuespert* (1st Dist.1981) Ind.App., 425 N.E.2d 229, 236. We cannot consider those events which are not supported by the record. *See Indiana & Michigan Electric Co. v. Pounds* (4th Dist. 1981) Ind.App., 428 N.E.2d 108; *Apple v. Hall* (1st Dist.1980) Ind.App., 412 N.E.2d 114. Nor are we required to search the record to reverse the trial court's ruling. *State v. Edgman* (4th Dist.1983) Ind.App., 447 N.E.2d 1091.

■ The main cause which Briggs asserted in this motion was bias and prejudice against Briggs' counsel. Generally, only a personal prejudice for or against a party to the cause will disqualify a judge. *Leistikow v. Hoosier State Bank* (3d Dist.1979) Ind.App., 394 N.E.2d 225. A mere showing of a strained relationship between the judge and a party's attorney is not ground for disqualification of the judge. *Id.*

"Only when the relationship between the judge and attorney is of a nature calculated to impair the judge's fairness or impartiality or to sway his judgment is the judge obligated to disqualify himself.

Although the relationship between the judge and Leistikow's attorney was less than ideal, Leistikow has failed to provide us with any indicia that he was the victim of bias and prejudice stemming from that relationship." *Id.* at 227.

We note that by the time of trial, Judge Munro had been subjected to five motions for change of judge, most of them containing accusations likely to catch the attention of even the most fair-minded judge. Trial Rule 76(8) restricts review to an abuse of discretion. Our cases require an unreasonable, arbitrary, or unconscionable attitude on the part of the trial judge. *See Bielat v. Folta* (1967) 141 Ind.App. 446, 228 N.E.2d 888. Briggs has not made such a showing in any of his motions nor in the record of this case. The January 17, 1980 motion for change of judge was properly denied.

Finally, on April 30, 1980, Briggs made an oral motion for change of judge based on bias and prejudice. This motion did not comply with the requirements of Trial Rule 76(8) and was properly denied.

## VI.

### CURTAILMENT OF DEPOSITION CROSS EXAMINATION AND PREMATURE CONSIDERATION OF DEPOSITION

Briggs next argues that the trial court abused its discretion in terminating the deposition before he had completed cross-examining Smoker; in ordering that, if cross-examination were to continue, Briggs would have to pay for it; and in reading Smoker's deposition in advance of trial.

Trial Rule 30(D) provides in part:

"At any time during the taking of a deposition, on motion of any party . . . and upon a showing that the examination is being conducted in bad faith or in such a manner as unreasonably to annoy, embarrass, or oppress the . . . party, the court . . . may order the officer conducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in Rule 26(C).

If the order made terminates the deposition, it shall be resumed thereafter only upon the order of the court in which the action is pending."

The purpose of the rule is to protect parties in light of the liberal rights of discovery granted by Trial Rule 26. To prevent the abuse of these rights, all phases of the examination are subject to the control of the court. Its orders are reviewable only for an abuse of discretion. Wright & Miller, 8 *Fed.Prac. & Proc.* § 2116 (1970). *See also Justak v. Bochnowski* (3d Dist. 1979) Ind.App., 391 N.E.2d 872, *cert. denied,* 449 U.S. 828, 101 S.Ct. 92, 66 L.Ed.2d 31.

One of the factors to be considered in ruling upon a motion to terminate a deposition is the physical condition of the witness. *De Wagenknecht v. Stinnes* (1957) 100 U.S.App.D.C. 156, 243 F.2d 413, involved a deponent similar in condition to Smoker. The Circuit Court of Appeals determined that the trial court did not abuse its discretion in terminating the cross-examination when fair and ample opportunity had been given to do so and when the delicate state of the witness' health made it appear that further examination would be oppressive.

Here, the trial court did not absolutely terminate the deposition. It merely ordered that Briggs could resume cross-examination on condition that all further cross-examination would be at his expense. Briggs did not take advantage of this opportunity. Rather, he claimed in the trial court and he argues here that he had a right to fully cross-examine Smoker at *her* expense.

There is no Indiana precedent on this matter; nor has either party referred us to authority on the propriety of assessment of costs against a party who has not initiated a deposition. Our search, however, reveals federal guidance. *See Gumz v. Starke County Farm Bureau Cooperative Ass'n, Inc.* (1979) 271 Ind. 694, 395 N.E.2d 257.

The rules themselves are silent with respect to the party who may be required to bear the costs of depositions. Trial Rule

30(C) provides in part: "If requested by one of the parties, the testimony shall be transcribed." Federal Rule 30(c) is identical to our rule in this respect. This part of the rule was explained in the federal Advisory Committee's notes as follows: "The fact of the request is relevant to the exercise of the court's discretion in determining who shall pay for the transcription." Wright & Miller, 12 *Fed.Prac. & Proc.,* Appendix C at 450.

Generally, the party instigating a deposition pays for the costs necessarily incurred as a result of the deposition, such as transportation costs and stenographic reporter's fees as well as transcription and filing fees. *See Kolosci v. Lindquist* (N.D. Ind.1969) 47 F.R.D. 319. *Accord, Caldwell v. Wheeler* (D.Utah 1981) 89 F.R.D. 145. However, the federal cases are not in agreement whether the trial court, under appropriate circumstances, may depart from the general rule.

We believe the better-considered rule to be that the trial court has discretion to require the non-initiating party to pay for discovery costs when, as here, it determines that the discovery process has been abused. *See Kolosci v. Lindquist, supra,* 47 F.R.D. at 321. In *Kolosci,* the District Court noted that Trial Rule 30(D) is designed to give relief from such abuse, and that requiring a party to pay part or all of the costs might also appropriately curtail "a prolonged and harrassing cross-examination designed to build up the cost of the deposition." *Id. See also Williams v. St. Joseph Hospital* (7th Cir.1980) 629 F.2d 448, 454; *Caldwell v. Wheeler* (D.Utah 1981) 89 F.R.D. 145; *Dall v. Pearson* (D.D.C.1963) 34 F.R.D. 511. *Contra Burke v. Central-Illinois Securities Corp.* (D.Del.1949) 9 F.R.D. 426 (instigating party always has obligation to pay costs).

In her motion to terminate the deposition, Smoker stated that her direct examination had taken approximately six hours, comprising 149 pages in the deposition. She stated that Mr. Ives, co-counsel for Briggs, cross-examined Smoker for approximately six hours, comprising 199 pages of transcript. Thereafter, Mrs. Briggs, co-counsel for Briggs, cross-examined Smoker for approximately ten hours, comprising approximately 300 pages of transcript. Mrs. Briggs spent by far the greater portion of her cross-examination asking and reasking the same questions.

In his motion requesting resumption of the deposition, Mr. Briggs stated that at the time the court stopped the deposition, only four of a contemplated 39 subjects had been covered on cross-examination. Continuation of the cross-examination at the same snail's pace plainly would have been burdensome to Smoker. We hold that the trial court did not abuse its discretion in ordering that the deposition could be resumed only at Briggs' expense.[4]

In determining whether to order resumption of the deposition of Smoker, the trial court examined the deposition. Briggs claims it was error for the trial court to read the deposition in advance of trial. However, he cites us to no authority, nor does he present any cogent argument relating to this claimed error. *See* Ind.Rules of Procedure, Appellate Rule 8.3(A)(7); *Newell v. Standard Land Corp.* (1973) 156 Ind. App. 597, 297 N.E.2d 842. Therefore, he has waived this alleged error.

Even were it otherwise, any error in examining the deposition prior to ruling on Briggs' motion to resume was harmless. As we have already observed, *supra* at 25, the trial court was not required to hold a hearing before termination or limiting the deposition. The question to be considered in ruling on the motion to terminate the deposition was not the evidentiary substance of the deposition but rather how the examination was being conducted. *See*

---

4. Our holding is clearly consistent with other discovery rules relating to sanctions and the award of expenses and attorney fees when the discovery process is abused. *See* Trial Rule 37(A)(4) which authorizes an award for expenses and attorney fees in connection with obtaining the termination or limitation of a deposition but does not specifically authorize an award for the cost of a portion of the deposition itself.

*Ross v. Cities Service* (D.C.Mo.1957) 21 F.R.D. 34. In order to do so, the trial judge rightly examined the "best evidence" of the conduct of the examination, i.e., the deposition itself.

Our Supreme Court has held that, until a deposition has been published, it "cannot be taken into account by the court in ruling on any motions of the parties." *Augustine v. First Federal Savings & Loan Ass'n of Gary* (1979) Ind., 384 N.E.2d 1018. However, the Supreme Court stated this rule in the context of a deposition which had never been published and in the context of a summary judgment motion dispositive of the merits. The rule was considered in similar context in *State v. Fair* (1983) Ind., 450 N.E.2d 66. Smoker's deposition was formally published at the beginning of the trial. Although the record does not include a transcript of this portion of the trial, it also appears that the entire deposition was read into evidence. Therefore, unlike the conditional examination in *Augustine, supra,* the deposition here was in fact formally published upon motion of Smoker, albeit after a portion of it had been reviewed by the court for procedural purposes. We might nevertheless observe that "publication" in its strict sense i.e., ". . . breaking of the sealed envelope containing the [deposition] and making it available for use by the parties or the court" (*Augustine v. First Federal Savings & Loan Ass'n of Gary, supra,* 384 N.E.2d at 1020) must necessarily have been accomplished before the court's order limiting the deposition. The court could not have been aware of its contents, were it otherwise. *But see State v. Fair, supra,* 450 N.E.2d 66.

In any event, it appears from the trial court's order here that it confined itself merely to an examination of the conduct of the cross-examination solely with reference to a procedural collateral matter, not with regard to the merits of the cause. We cannot see how Briggs was prejudiced thereby.

## VII.

### DENIAL OF CONSERVATOR FEES

In its judgment, the trial court found that no attorney fees or conservator fees should be allowed in the conservatorship. Its basis for this conclusion, as explained in the court's opinion, was that the conservator had been guilty of a serious breach of the fiduciary duty toward his ward in that, while purporting to seek the termination of the conservatorship after Smoker regained her competency, he actually opposed it and in fact delayed termination for approximately three months.

Briggs argues that the trial court erred in blaming him for delaying the termination of the conservatorship. In his argument, Briggs points to a statement of the trial judge during a hearing on May 11, 1977, acknowledging that the trial judge had delayed the cause about three months. He also points out that the trial judge qualified on February 28, 1977, but took no action until March 29, 1977. Because the trial judge was "a busy special judge" and because, according to the trial judge, the Petition to Discharge contained allegations which could easily have consumed days in litigation, Briggs argues that he could not be charged with the delay. (Appellant's Brief at 286.)

We must uphold the trial court's general judgment if there is a valid legal theory upon which the trial court's action may be sustained. *Indiana & Michigan Electric Co. v. Schnuck* (1973) 260 Ind. 632, 298 N.E.2d 436. Without regard to whether Briggs alone delayed the termination of the conservatorship, we hold that the trial court did not abuse its discretion in denying Briggs fees in the conservatorship.

 If a guardian commits a breach of his fiduciary duty, the court, in its discretion, may deny him all compensation. I.C. 29–1–18–45 (Burns Code Ed.1972). *See also* 39 Am.Jur.2d *Guardian & Ward* § 184 (1968). A guardian is under a duty to his ward to administer the estate solely in the interests of the ward. I.C. 29–1–18–28(b); I.C. 30–4–3–7(b)(1). *See also Restatement of Trusts* § 170 (1935). We find that the trial court did not abuse its discretion in denying Briggs compensation for his serv-

ices as conservator because Briggs had breached his duty to the ward.

■ At least two conflicts of interest may have been reasonably found to have subverted Briggs' sense of professional responsibility. The foremost was that he, his wife, his son and his law firm all stood to benefit under Smoker's will. Another conflict lay in Briggs' inducement of Smoker to execute the $9,000.00 joint certificate of deposit and the legal services contract shortly before the opening of the conservatorship.

In addition, Briggs' behavior following the initiation of this proceeding demonstrated a lack of loyalty to his ward. Shortly after the Petition to Discharge was filed, Briggs filed his verified Petition to Terminate. In it, he alleged that the conservatorship should be terminated, citing the doctors' opinions that Smoker was competent. Thereafter, counsel for Smoker sent Briggs a letter agreeing to the Petition to Terminate and enclosing a suggested decree. Briggs did not respond.

On April 12, 1977 Smoker filed a reply to the Petition to Terminate agreeing to terminate the conservatorship. On April 19, 1977 Smoker filed a motion for summary judgment, asking for judgment upon the Petition to Terminate. Upon Briggs' request, the trial judge postponed a hearing thereon from April 19 to May 11, 1977.

On May 9, 1977 the trial court entered an order limiting the issues to those raised by Briggs' Petition to Terminate and also informing the parties that the court would take judicial notice of the reports of the examining physicians. These actions called forth a nine-page response from Briggs. In this document, Briggs argued that the granting of a judgment on his own Petition to Terminate without also hearing the Petition to Discharge would do "irreparable harm" to Briggs. As the trial court put it:

"In words of one syllable, he was demanding that Mary Bernice Smoker was to be kept under the guardianship which made her 'unhappy' and 'frantic' until a full hearing had been held solely for the benefit of Mr. Briggs on the Petition to

[Discharge] . . . . Of all the law's delays, none is more reprehensible than an unnecessary delay in restoring the personal freedom to which a person is entitled as a matter of simple right. Once again, the 'conflict of interest' had overpowered the sense of professional responsibility." Record at 32.

We hold that the trial court did not abuse its discretion in denying fees to Briggs.

## VIII.

### EXCLUSION OF PORTION OF PRIOR TESTIMONY OF UNAVAILABLE WITNESS

■ Briggs, at trial in 1979, attempted to introduce into evidence a small portion of the testimony given by Beverly Hawes on May 11, 1977, during the hearing on Smoker's competency. The trial court would not permit this testimony to be admitted unless all of her testimony at the prior hearing were admitted.

The exhibit containing Beverly Hawes' snippet of testimony was properly excluded. It is on its face without probative value. As stated by the trial court: "It is simply a statement by the witness that at some unspecified time the witness told Mrs. Briggs that some unspecified 'she' did not want 'Bill' to resign from some unspecified position." Record at 178. We cannot infer from a blank record to whom or to what the reference was made.

In his Motion to Correct Error, Briggs avers that Hawes' testimony would have revealed that Briggs knew as early as the first Friday in March 1977 that Smoker had made a new will. No such statement appears in the exhibit which was offered. It would appear that Briggs is attempting to establish that the trial court erred by excluding evidence never offered.

The trial court did not err in this regard.

## IX.

### ATTORNEY–CLIENT PRIVILEGE CONCERNING PRIOR WILLS

Briggs argues that the trial court erred in not permitting Ralph Hanna, an attorney,

to testify about Smoker's previously executed wills. The four previous wills had been drawn by Hanna or his brother, also an attorney. The trial court excluded Hanna's testimony on the ground that the documents and any communications relating to them were protected by the attorney-client privilege.

Briggs claims that no attorney-client privilege applies, citing *Kern v. Kern* (1900) 154 Ind. 29, 55 N.E.2d 1004 and *Estate of Voelker* (1st Dist.1979) Ind.App., 396 N.E.2d 398. Upon examination of these cases, it is evident that they support the opposite conclusion.

 The general rule excludes testimony of communications between a client and his attorney regarding the preparation of a will. *Gurley v. Park* (1893) 135 Ind. 440, 35 N.E. 279. *See also* 81 Am.Jur.2d *Witnesses* § 201 (1976). The documents themselves are also privileged. *Id.* § 203. After the client dies, however, and a controversy arises concerning the validity of the will or between the claimants under the will, an exception has been engrafted upon the general rule of privilege.

 The Supreme Court recognized the exception in *Kern v. Kern, supra,* 154 Ind. at 34, 55 N.E. at 1006:

"While the rule announced by the court in *Gurley v. Park, supra,* is doubtless the correct one in disputes between the client's representatives on the one hand, and strangers on the other, we do not think it applies where both the litigating parties claim under the client . . . . We regard this qualification of the general rule as a very material one, and, to the extent that the opinion in *Gurley v. Park, supra,* conflicts with the view we have expressed, that case is overruled."

When the party seeking to invoke the exception is a claimant adverse to the interests of the client, his estate or his successors, however, the privilege protecting the client's communications to the attorney who drew his will may be invoked. *See Doyle v. Reeves* (1931) 112 Conn. 521, 152 A. 882 (servant's claim against testator's estate for

services performed); *Re Smith's Estate* (1953) 263 Wis. 441, 57 N.W.2d 727 (claim against the decedent's estate for breach of a contract to benefit by will). *Cf. Re Breese's Estate* (1959) 7 Wis.2d 422, 96 N.W.2d 712 (privilege does not apply when all parties claimed under the will).

*Estate of Voelker, supra,* 396 N.E.2d 398, is equally unsupportive of Briggs' contention. The Court in *Voelker* recognized in dictum the exception noted in *Kern v. Kern, supra.* However, the Court stated that the claimant was a stranger to the estate and therefore was in no position to cause the privilege to be removed. 396 N.E.2d at 399.

 Briggs, as conservator, is a stranger with respect to the previous wills, and his claim is adverse to Smoker's successors. Thus the privilege applies to exclude any testimony regarding the prior wills. We hold that the trial court did not err in excluding the testimony of Ralph Hanna.

## X.

## DISALLOWANCE OF COSTS OF DUPLICATION

Briggs next argues that the trial court erred in requiring Briggs to repay the Bank part of the amount he charged for duplicating a deposition.

Briggs filed two motions to correct error on the same date. The first motion (in the order in which they were stapled together) attacked only the court's orders requiring Briggs to repay the Bank for charges for copying a deposition. The second motion attacked numerous other actions of the trial court.

The Bank argues that we may consider only the error assigned in the first motion to correct error, citing *State v. Steinmetz* (1971) 257 Ind. 60, 272 N.E.2d 320. In *Steinmetz* the Supreme Court held that a party filing a motion to correct error must include all the errors occurring at trial in its original motion. The plaintiff in that case had filed a second motion to correct error sometime after the original motion to correct error was overruled. The Court stated:

"Such errors were required to have been included in the original motion. To hold otherwise would be to misconstrue trial rule 59(G) [now substantially restated in Trial Rule 59(D)(1)] and permit the filing of multitudinous motions to correct errors and innumerable appeals following the ruling upon each motion. This is not the intent or spirit of the rule." *Id.* at 64, 272 N.E.2d at 322.

█ Here, both motions were filed at the same time. Although Trial Rule 59(D)(1) requires the motion to correct error to address "those errors claimed to have occurred prior to the filing of the motion," Briggs' filing of two motions at the same time is not fatal to all errors alleged in the motion which happened to have been stapled behind the first motion. To so hold would be to exalt form over substance. *Steinmetz* is to be distinguished. Accordingly, we will treat both motions as a single timely-filed motion.

█ The particular ruling sought to be attacked ordered Briggs to reimburse the Special Administrator a portion of the cost charged by Briggs for making a copy of Bertha Wolfe's deposition. In support of this assertion, however, Briggs refers solely to an alleged understanding between Briggs and the attorneys for the estate with respect to the costs for duplicating the deposition of the ward, Smoker. We fail to see any relationship between an alleged agreement as to the costs for copying one deposition and the costs for duplicating an entirely different deposition. Accordingly, we reject Briggs' assertion of error in this respect.

## XI.

### NEWLY DISCOVERED EVIDENCE

Briggs attempts to obtain a new trial on the basis of newly discovered evidence. The alleged newly discovered evidence is a tape recording of an attorney-client conference involving Smoker and R. Adrian Marks.

█ It was incumbent upon Briggs to demonstrate that the evidence could not

have been discovered before the trial by the exercise of due diligence. *Ligon Specialized Hauler, Inc. v. Hott* (4th Dist.1979) Ind. App., 384 N.E.2d 1071; *Kelly v. Bunch* (3d Dist.1972) 153 Ind.App. 407, 287 N.E.2d 586. There is a strong presumption that the alleged evidence might have been discovered prior to trial. *Shaw v. Shaw* (2d Dist.1973) 159 Ind.App. 33, 304 N.E.2d 536. In addition, the element of due diligence requires the proponent to set out facts showing the exercise thereof. The bare assertion of due diligence is insufficient. *Mikesell v. Mikesell* (4th Dist.1982) Ind.App., 432 N.E.2d 55.

We concur in the trial court's opinion on the Motion to Correct Error in which it stated:

"Reasonable diligence in the use of discovery techniques during the period of over two years that the case was pending would certainly have succeeded in bringing to light the existence of the tape before the commencement of trial .... No diligence at all was shown." Record at 179.

Accordingly, we find no error in the trial court's refusal to grant a new trial on the ground of newly discovered evidence.

## XII.

### COST OF TRANSCRIPTS FILED BY APPELLEE

The Bank argues that Briggs should be assessed the cost for the additional transcript which the Bank has filed in this appeal. The Bank cites Appellate Rule 15(H). That rule mandates that the appellee recover costs, including the fee paid for procuring a transcript, when the judgment is affirmed. The Bank's position is well-taken.

█ When the record is incomplete, the appellee need not file an additional transcript. He may, however, point out the omissions of the appellant. We may then, in our discretion, order the additional evidence or documents transcribed. *See* Appellate Rule 7.2(C)(2). In addition, if the appellee feels constrained to praecipe portions of the record and to submit those

portions to us, we may, in appropriate instances, tax the costs thereof to the appellant. If appellee does not respond to the record as submitted by appellant, he risks our acceptance of appellant's argument and reversal of the judgment upon grounds of insufficient evidence.

An appropriate instance is presented here. We have been faced with an arduous task in attempting to make sense from the distorted and confusing record submitted by Briggs. Briggs' record was a hodgepodge of documents and evidence presented in no chronological order. Some documents listed in his table of contents were not to be found on the pages indicated. Other relevant documents were buried with absolutely no page references. Testimony and documents which, though relevant, would have reflected adversely upon Briggs were noticeably lacking. Further, highly relevant evidence was omitted. For instance, Briggs did not submit *any* of his testimony regarding the alleged oral contract between himself and Smoker. We cannot surmise how Briggs intended us to find the existence of an oral contract without evidence of it in the record. Statements made in briefs are not evidence.

■ The record submitted by the Bank aided our review of the issues herein. Evidence it submitted clearly placed in issue matters which Briggs claimed were undisputed. Documents it submitted served to explain seemingly mysterious rulings of the trial court. We hold that Briggs should be charged for the costs of the transcript submitted by the Bank.

### XIII.

### ATTORNEY FEES

■ The Bank contends that it should be granted attorney fees as damages under Appellate Rule 15(G). That rule provides:

> "If the court on appeal affirms the judgment, damages may be assessed in favor of the appellee not exceeding ten per cent (10%) upon the judgment, in money judgments, and in other cases in

the discretion of the court; and the court shall remand such cause for execution."

Such damages are an extraordinary measure. *In re Estate of Watson* (1983) Ind. App., 449 N.E.2d 1156. A discretionary award of damages is appropriate when the appeal "is frivolous, or without substance or merit." *Marshall v. Reeves* (1974) 262 Ind. 403, 404, 316 N.E.2d 828, 830. When the appeal is taken merely to harass the appellee or delay enforcement, a penalty may be assessed. *Id.* Failure to follow proper appellate practice in presenting cogent legal reasoning and citation to relevant legal authority, however, is not sufficient to establish bad faith. *Sandock v. Taylor Construction Corp.* (3d Dist.1981) Ind.App., 416 N.E.2d 882. Nonetheless, outrageous misstatements of the record and statements of "outright fallacy," coupled with contentions of error of "no merit whatsoever" may subject the appellant to such a penalty. *In re Estate of Watson, supra,* 449 N.E.2d at 1160.

The Bank's contention that we may award attorney fees as damages under Appellate Rule 15(G) is a novel one. Generally, each party must bear the cost of his own counsel fees in the absence of a statute or agreement to the contrary. *Trotcky v. Van Sickle* (1949) 227 Ind. 441, 85 N.E.2d 638. This general rule has been eroded by various exceptions in recent years. One of the exceptions permits the court to use its inherent equitable powers to award such fees when a party has acted in bad faith (the so-called obdurate behavior exception). *Cox v. Ubik* (3d Dist.1981) Ind.App., 424 N.E.2d 127.

■ Nevertheless, a strong showing is required to justify an award of attorney fees under this exception. *St. Joseph College v. Morrison, Inc.* (1973) 158 Ind.App. 272, 280, 302 N.E.2d 865, 871. The nature of such an award is punitive, but is also designed to reimburse a prevailing party who has been unduly subjected to great expense. *Cox v. Ubik, supra,* 424 N.E.2d at 129.

When there is no money judgment by which to measure the appropriate award under Appellate Rule 15(G), an award of attorney fees may compensate the prevailing party. *Compare Parrish v. Terre Haute Savings Bank* (4th Dist.1982) Ind.App., 438 N.E.2d 1 (on rehearing) (appellate attorney fees awarded under contractual provision for "reasonable attorney's fees"). Such an award, however, should be dispensed sparingly in order not to chill the exercise of a party's right to judicial review. *See Ind. Const.* Art. 1, § 12.

An award of attorney fees is appropriate in this case. The Appellant's Brief is rife with outrageous misstatements of the record. There is evidence in the record that Briggs told Smoker that her estate would never be settled and that when it finally was, it would not be worth fifteen cents. Appellant's Brief appears to have been written in a manner calculated to require the maximum expenditure of time both by counsel for Smoker and by this Court. *Marshall v. Reeves* (1974) 262 Ind. 403, 404, 316 N.E.2d 828, 830; *Vandalia R. Co. v. Walsh* (1909) 44 Ind.App. 297, 89 N.E. 320.

We note, however, that the Bank has failed to submit any proof, by affidavit or otherwise, of the amount of attorney fees which would be appropriate. *See Appellate Rule 15(J).* Without more information about the services rendered and the customary charges for such services, it cannot be determined what charges are reasonable. *See Loudermilk v. Casey* (1st Dist. 1982) Ind.App., 441 N.E.2d 1379. *See also Sears, Roebuck & Co. v. State* (1967) 248 Ind. 169, 225 N.E.2d 175; *Lystarczyk v. Smits* (3d Dist.1982) Ind.App., 435 N.E.2d 1011; *U.S. Aircraft Financing, Inc. v. Jankovich* (4th Dist.1980) Ind.App., 407 N.E.2d 287. Attorney fees cannot be awarded in a void.

In the absence of proof, only nominal damages may be awarded. *Brauns v. Glesige* (1891) 130 Ind. 167, 29 N.E. 1061; *Smith v. Bruning Enterprises, Inc.* (1st Dist. 1981) Ind.App., 424 N.E.2d 1035.

We note that in recent years there has been considerable disagreement whether a trial court may fix the amount of attorney fees to be awarded without evidence of the amount appropriate. (*See* the excellent discussion of this issue and a review of applicable cases in *Berkemeier v. Rushville National Bank* (1st Dist.1982) Ind.App., 438 N.E.2d 1054.) As an appellate court, we have considerably less acquaintance with the course of the lawsuit, especially when, as here, the record of the proceedings is incomplete. Moreover, we do not see how the requirement that counsel make a showing of appropriate fees would be unduly burdensome.

We reverse the trial court's award to Briggs of $25.00 for services he rendered during the period of time between execution of the legal services contract and the opening of the conservatorship.

The Bank's request that Briggs be assessed for the additional transcript filed herein is granted. Its request for attorney fees is granted and the cause is remanded to the trial court for an award of such attorney fees as may be determined to be appropriate. The trial court's judgment is in all other things affirmed.

BUCHANAN, C.J., and SHIELDS, J., concur.