

FILED

Oct 30 2017, 11:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Stephen R. Pennell
William P. Kealey
Stuart & Branigin, LLP
Lafayette, Indiana

ATTORNEY FOR APPELLEE

Edward W. Hearn
Johnson & Bell, P.C.
Crown Point, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Board Of Trustees Of Purdue University, d/b/a Purdue University and Purdue Calumet; Thomas Keon, individually and in his official capacity as Chancellor of Purdue University Calumet; Saul Lerner, individually and in his official capacity as Professor at Purdue University Calumet; Miriam Joyce, individually and in her official capacity as Professor at Purdue University Calumet; Kathleen Tobin, individually and in her official capacity as Professor at Purdue University Calumet; Colin Fewer, individually and in his official capacity as Professor at Purdue University Calumet; Fahima Ali Jackson, individually and in her

October 30, 2017

Court of Appeals Case No.
45A04-1612-PL-2728

Appeal from the Lake Superior Court

The Honorable John R. Pera, Judge

Trial Court Cause No.
45D10-1205-PL-49

official capacity as Professor at Purdue University Calumet,

*Appellants-Defendants,*

v.

Dr. Maurice Eisenstein,

*Appellee-Plaintiff*

**Barnes, Judge.**

# Case Summary

[1] In this interlocutory appeal, the Board of Trustees of Purdue University, d/b/a Purdue University and Purdue Calumet, Thomas Keon, individually and in his official capacity as Chancellor of Purdue University Calumet, and Saul Lerner, Miriam Joyce, Kathleen Tobin, Colin Fewer, and Fahima Ali Jackson, individually and in their official capacities as professors at Purdue University Calumet (collectively, "Defendants"), appeal the trial court's denial of their motion for summary judgment in an action brought by Maurice Eisenstein. On cross-appeal, Eisenstein appeals the trial court's denial of his motion for summary judgment in his action against the Defendants. We affirm the denial of Eisenstein's motion for summary judgment and reverse the denial of Defendants' motion for summary judgment.

# Issues

The parties raise numerous issues on appeal and cross-appeal, which we consolidate and restate as:

I. whether the trial court properly denied the Defendants' motion to strike;

II. whether the trial court properly denied summary judgment on Eisenstein's 42 U.S.C. § 1983 claims;

III. whether the trial court properly denied summary judgment on Eisenstein's § 1985 claim;

IV. whether the trial court properly denied summary judgment on Eisenstein's concerted action claims;

V. whether the trial court properly denied summary judgment on Eisenstein's breach of contract claim; and

VI. whether the trial court properly denied summary judgment on Eisenstein's declaratory relief claim.

# Facts[1]

Purdue has an Anti-Harassment Policy ("Policy") that provides:

---

[1] Eisenstein argues that the "majority of evidence upon which Purdue relies is inadmissible hearsay" and that we should not consider the evidence on appeal. Appellee's Br. p. 75. The Defendants argue that Eisenstein has waived his argument by failing to raise hearsay issues to the trial court. We agree. "Issues not raised before the trial court on summary judgment cannot be argued for the first time on appeal and are therefore waived." *Yoost v. Zalcberg*, 925 N.E.2d 763, 770 (Ind. Ct. App. 2010), *trans. denied*. Eisenstein did not raise the hearsay argument before the trial court and has waived the issue.

Eisenstein also argues that the Defendants failed to cite to the record or authority. "A litigant who fails to support his arguments with appropriate citations to legal authority and record evidence waives those arguments for our review." *Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015); Ind. Appellate Rule 46(A)(8)(a). Unless we find a party's "non-compliance with the rule sufficiently substantial to impede our consideration of the issue raised," we will address the merits of the claim. *Pierce*, 29 N.E.3d at 1267. Eisenstein cites to

> Purdue University is committed to maintaining an environment that recognizes the inherent worth and dignity of every person; fosters tolerance, sensitivity, understanding and mutual respect; and encourages its members to strive to reach their potential. The most effective way to work toward preventing Harassment is through education that emphasizes respect for every individual. . . . Harassment in the workplace or the educational environment is unacceptable conduct and will not be tolerated. Purdue University is committed to maintaining an educational and work climate for faculty, staff and students that is positive and free from all forms of Harassment. This policy addresses Harassment in all forms, including Harassment toward individuals with legally protected status for reasons of race, gender, religion, color, age, national origin or ancestry, genetic information or disability and Harassment toward individuals for other reasons such as sexual orientation, gender identity, gender expression, marital status or parental status.

Appellants' App. Vol. IV p. 224. The Policy also provides: "Retaliation against faculty members, staff members or students for reporting or complaining of Harassment, for assisting or participating in the investigation of a complaint of Harassment, or for enforcing this policy is strictly prohibited." *Id.* The Policy addresses freedom of speech and provides:

> Freedom of thought and expression are the lifeblood of our academic community and require an atmosphere of mutual respect among diverse persons, groups and ideas. The maintenance of mutually respectful behavior is a precondition for the vigorous exchange of ideas, and it is the policy of the

numerous pages of Appellants' Brief without providing any specific examples of deficiencies and without demonstrating that Defendants' alleged noncompliance impedes our consideration of the appeal. Consequently, we will address the merits of Defendants' claims.

University to promote such behavior in all forms of expression and conduct. The University reaffirms its commitment to freedom of speech as guaranteed by the First Amendment to the United States Constitution. Accordingly, any form of speech or conduct that is protected by the First Amendment is not subject to this policy. The University reaffirms its commitment to academic freedom, which is essential to its educational mission and is critical to diversity and intellectual life.

*Id.* at 225.

[4] Individuals who wish to file a complaint for harassment may do so under Purdue's Procedures for Resolving Complaints of Discrimination and Harassment ("Procedures"). The Procedures require a complaint to be filed within 120 days of an incident and require notice to the respondent and an opportunity to be heard. After a complaint is filed, the Chancellor is required to assign an investigator, and the investigator is required to deliver a report on the investigation to the Chancellor. Within fifteen days of receiving the report, the Chancellor may convene a three-member panel to advise him or her. After the meeting, the Chancellor "shall make a written determination whether a violation of University policy has occurred." *Id.* at 237. If the complaint is not substantiated, "reasonable efforts will be taken to restore the reputation of the Respondent." *Id.*

[5] Eisenstein is an associate professor of political science at Purdue University Calumet. Lerner, Joyce, Tobin, Fewer, and Jackson are also professors at Purdue University Calumet. In the spring semester of 2011, a student was taking Eisenstein's Introduction Into Judaism class. On the first day of class,

Eisenstein said, "I am glad none of them [Muslims] are in this class." Appellants' App. Vol. II p. 174. Eisenstein also said, "Slavery is nothing compared to what Jews went through" and "The world would be a better place if someone took a gun and shot a bullet into a Muslim's head." *Id.* at 174-75. The student recorded Eisenstein during a subsequent class. That recording included the following statements:

"No peace treaty is possible for Jews in a state with Muslims."

"There is no basis for racism or discrimination for others when compared to Judaism."

"Everybody complains (Blacks, Hispanics, Women, Asians and Arabs-all crying); however, others have only gone through bad times unlike the Jews."

"Our idiot President now, whatever his name is."

"Muslims kill everybody else."

"Nothing happened to Blacks in the 1960's-not real problems."

"You ca[n] say whatever you want to say about Jews if you are Muslim or Arab and everybody puts up with it."

"Why is it that there is a problem with lynching a Black, but there is no problem with lynching a Jew?"

"Israel [is] hated based on envy and greed."

"Why are Arabs/Muslims so opposed to Israel?" "You cannot explain it because there is no rational explanation. Muslims have historically made no difference. For thousand[s] of years, Muslims haven't contributed anything to society. Oil doesn't count because it is underground and has nothing to do with being Muslim. Except for raping four year-olds, Muslims are not good for anything."

"Luxembourg (a small city in Europe) has produced more scholarly work then [sic] all of the Muslim countries. There is no research, no acclaimed university and no travel worth while in Muslim countries."

"'If they [Muslims] didn't exist would any of you miss them or care?"

*Id.* at 175-76.

[6] Student Wala Issa was enrolled in one of Eisenstein's classes in August 2011. During the class, Eisenstein stated:

Muslims are corrupt and they are corrupting the world; Muslims are no good and all they are good for is their food; Muslims are such bad people; Muslims are hated by everyone with a passion, especially Indians; Muslims are terrorists; Muslims settle things by killing people who are not from the same religion.

*Id.* at 172. Issa spoke to the Department Chair, Professor Richard Rupp, about Eisenstein's class, and Issa was withdrawn from the class and placed in independent study with Rupp. Rupp discussed the matter with Eisenstein. In October and November 2011, Eisenstein posted several anti-Muslim statements

on his personal Facebook page, including a statement that Issa is a "Jew hater." *Id.* at 174.

[7] As a result of Eisenstein's statements in class and on Facebook, some students and faculty created a private Facebook group to discuss Eisenstein, held a protest on campus, and started a change.org petition to have Eisenstein's employment with Purdue terminated. A public forum was held to discuss the students' concerns. During this time, some students and faculty were communicating privately with each other regarding Eisenstein's behavior and how to file complaints against him. On November 15, 2011, Professor Jackson met with Chancellor Keon and Professor Rupp to get information regarding procedures for filing a complaint against Eisenstein. Chancellor Keon told Jackson that, if she decided to file a complaint, the complaint should be based on substance, not feelings. Chancellor Keon also informed Jackson of a time limit for filing complaints. Jackson later sent an email to Tobin and Joyce advising them that Chancellor Keon suggested quickly filing complaints against Eisenstein and that the focus of the complaints should be "based on substance and not emotion." Appellants' App. Vol. VI p. 223. At some point in November 2011, Tobin also met with Chancellor Keon. Chancellor Keon advised Tobin that he could not give her details on the complaints.

[8] In November 2011, Chancellor Keon received nine complaints against Eisenstein pursuant to Purdue's Policy and Procedures. The complaints were filed by three students, the Muslim Student Association, and Professors Joyce,

Jackson, Lerner, Tobin, and Fewer. Chancellor Keon appointed Mariah Butler to investigate the complaints.

[9] Professors Lerner and Joyce later filed additional complaints regarding retaliation by Eisenstein. Joyce alleged that, after she filed her complaint against Eisenstein, she saw him in the hallway of a campus building and said hello and that Eisenstein responded, "Now I know why your son committed suicide." Appellants' App. Vol. II p. 178. Lerner alleged that Eisenstein had sent him and others an email that stated: "My mother cursed [Lerner] before her death (a true orthodox curse). He knows why. Therefore, there will be no association with him. I consider anything from him to be in and of itself cursed and therefore untouchable." Appellants' App. Vol. III p. 89. Butler was again assigned to investigate the complaints.

[10] Butler wrote a report on her investigation, which she provided to Chancellor Keon. Butler concluded that Eisenstein violated the Policy by retaliating against Joyce and by harassing Issa. Chancellor Keon formed a panel to conduct a hearing. Eisenstein was present at the hearing with his attorney. After the hearing, the members of the panel made recommendations to Chancellor Keon. Chancellor Keon determined that Eisenstein had not breached the Policy except with regard to the retaliation complaints filed by Lerner and Joyce. Chancellor Keon issued letters of reprimand to Eisenstein on February 22, 2012. Per the Procedures, Chancellor Keon placed the letters in Eisenstein's personnel file and sent them to Joyce and Lerner. Eisenstein appealed the determination, but the appeal was denied.

[11]     During this time period, Eisenstein contacted Foundation for Individual Rights in Education ("FIRE"), an organization that provides assistance regarding free speech, and provided it with all of the relevant complaints and documents. FIRE wrote to Purdue and posted the letter to its website. It also posted Chancellor Keon's response on its website. Eisenstein also contacted members of the media and the state legislature regarding the complaints against him. After receiving Chancellor Keon's February 22, 2012 letter, Eisenstein told members of the media and posted on his blog that he had been cleared in the nine complaints. At a Faculty Senate meeting on March 7, 2012, Joyce informed the Faculty Senate that Eisenstein's statements to the media were incorrect, that he had been found to have retaliated against her, and that he had been reprimanded.

[12]     Also in March 2012, a cartoon drawn by a student was published in the student newspaper depicting Eisenstein as a puppeteer controlling the university's administration. Comments and discussions regarding Eisenstein were posted on a campus-wide listserv, and some of the Defendants discussed sending or sent letters regarding Eisenstein to other agencies or groups.

[13]     In May 2012, Eisenstein filed a complaint against the Defendants. Eisenstein alleged "administrative violations" against Purdue, violations of "Indiana Civil Rights under [the] Indiana Constitution" against the Defendants, and violations of the "right to privacy" against Joyce and Purdue. Appellants' App. Vol. II p. 33-41. The Defendants filed a motion to dismiss, which the trial court granted.

[14] Shortly before the trial court granted the motion to dismiss, Chancellor Keon received a complaint against Eisenstein from Professor Yahya Kamalipour regarding an entry on Eisenstein's personal blog entitled "Purdue Professor Yahya R. Kamalipour – How Anti-American?" In the blog entry, Eisenstein

> described Kamalipour as a "Muslim who was 'born and spend [sic] most of his upbringing in Iran.'" Eisenstein also said Kamalipour "has continued to enjoy the support of the Iranian Mullahs and most anti-American Iranian, if not other Muslims with the equivalent agenda." Eisenstein quoted a statement he claimed Kamalipour made "in a Muslim journal," and then asserted Kamalipour "is the justifier of Islamic hatred and death squads against women, Jews, Gays, Christians, and other infidels. He defends by his statements and actions the beheading and hanging in Iran of all Gays and Lesbians."

*Id.* at 158. Eisenstein had a link to his personal blog in the signature line of his Purdue email account, and the link was included in each email that Eisenstein sent. Chancellor Keon again appointed an investigator, David Blom. Chancellor Keon ultimately dismissed the complaint against Eisenstein, but he did not think the content of the blog met the "civility standards" at Purdue. *Id.* at 159. Chancellor Keon required Eisenstein to remove the link to his personal blog from the signature block of his university email. Chancellor Keon did not ask Eisenstein to "change the content of his blog or stop posting about Purdue University or its faculty." *Id.*

[15] Eisenstein filed an amended complaint, which he later amended again. In his second amended complaint, Eisenstein included the following claims: (1)

declaratory judgment against the Defendants that Eisenstein did not violate the Policy, that the Policy is void for vagueness, and that the Policy and its application to him are unconstitutional; (2) "concerted action in commission" of intentional infliction of emotional distress, deprivation of civil rights, and defamation; (3) breach of Eisenstein's employment contract; (4) a violation of Eisenstein's free speech rights filed under 42 U.S.C. § 1983; (5) a deprivation of Eisenstein's due process rights filed under 42 U.S.C. § 1983; (6) a conspiracy to violate Eisenstein's civil rights filed under 42 U.S.C. § 1985; and (7) another violation of Eisenstein's free speech rights filed under 42 U.S.C. § 1983 as a result of Chancellor Keon ordering Eisenstein to remove a link to his blog from his university email signature block. Appellants' App. Vol. II p. 106.

[16] In November 2014, the Defendants filed a motion for summary judgment. Eisenstein filed a response in October 2015 and a cross-motion for summary judgment. Eisenstein designated, in part, his affidavit. In November 2015, the Defendants filed a response and a motion to strike portions of Eisenstein's affidavit. In October 2016, the trial court denied the Defendants' motion for summary judgment, denied Eisenstein's cross-motion for summary judgment, and denied the Defendants' motion to strike Eisenstein's affidavit. Defendants filed a motion to certify the order for interlocutory appeal and stay the proceedings, which the trial court granted. We accepted the Defendants' interlocutory appeal pursuant to Indiana Appellate Rule 14(B).

# Analysis

[17] The parties' arguments concern the trial court's denial of Defendants' motion for summary judgment and the trial court's denial of Eisenstein's cross-motion for summary judgment. Summary judgment is appropriate only when the moving party shows there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *Schoettmer v. Wright*, 992 N.E.2d 702, 705 (Ind. 2013); *see also* Ind. Trial Rule 56(C). Once that showing is made, the burden shifts to the non-moving party to rebut. *Schoettmer*, 992 N.E.2d at 705-06. When ruling on the motion, the trial court construes all evidence and resolves all doubts in favor of the non-moving party. *Id.* at 706. We review the trial court's ruling on a motion for summary judgment de novo, and we take "care to ensure that no party is denied his day in court." *Id.*

## I. Eisenstein's Affidavit

[18] The Defendants filed a motion to strike portions of Eisenstein's affidavit, which the trial court denied. Affidavits in support of or in opposition to a motion for summary judgment are governed by Indiana Trial Rule 56(E), which provides in relevant part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The trial court has broad discretion in ruling on the admissibility of evidence. *Price v. Freeland*, 832 N.E.2d 1036, 1039 (Ind. Ct. App. 2005). "This discretion extends to rulings on motions to strike affidavits

on the grounds that they fail to comply with the summary judgment rules." *Id.*; *see also Doe v. Shults-Lewis Child and Family Services, Inc.*, 718 N.E.2d 738, 749 (Ind. 1999) ("An affidavit which does not satisfy the requirements of T.R. 56(E) is subject to a motion to strike . . . .").

[19] The Defendants' motion to strike concerned paragraphs 32 through 38, which provided:

> 32. In response to my FOIA requests, I received a packet of e-mails on January 17, 2012, from Kathleen Tobin's Purdue e-mail account. These e-mails revealed that Thomas Keon, Fahima Jackson, Miriam Joyce, Kathleen Tobin, Saul Lerner, and Colin Fewer were working together to file frivolous complaints against me, and encouraging students and faculty members to follow suit. These e-mails were the first notice that I received of my colleagues' conduct against me.

> 33. Following the November 2011 Investigation, Fahima Jackson, Miriam Joyce, Kathleen Tobin, Saul Lerner, and Colin Fewer have openly disparaged me to other members of the Purdue community.

> 34. As a result of the events of Purdue's 2011 and 2013 investigations, and the pattern of conduct that Fahima Jackson, Miriam Joyce, Kathleen Tobin, Saul Lerner, and Colin Fewer engaged in toward me for over four years, I have experienced extreme emotional distress.

> 35. My professional reputation has been damaged by Purdue's 2011 and 2013 investigations of me, resulting in a dramatic decrease in student enrollment in my courses.

36.     I have suffered additional penalties, as I have not been allowed to teach summer school or take sabbatical, and I was given a miniscule retroactive raise for the 2011 and 2012 (it was one year and I am not sure which one it was. I filed a grievance against it an [sic] lost) school year.

37.     I believe that Fahima Jackson, Miriam Joyce, Kathleen Tobin, Saul Lerner, Thomas Keon and Colin Fewer, the Board of Trustees, and the Purdue students involved in Purdue's investigation targeted me because of my race, religious affiliations, and political beliefs.

38.     Likewise, I believe that the events of Purdue's investigation were motivated by my race, religious affiliations, and political beliefs.

Appellants' App. Vol. VI pp. 165-66.

[20]    The Defendants argue that these paragraphs should be stricken because they contain inadmissible conclusions rather than personal knowledge. In particular, the Defendants point to Eisenstein's statements that the Defendants were "working together to file frivolous complaints," "openly disparaged" him, he "experienced extreme emotional distress," his "professional reputation has been damaged," he has "suffered additional penalties," the Defendants "targeted [him[ because of [his] race, religious affiliations, and political beliefs," and Purdue's investigation was "motivated by [his] race, religious affiliations, and political beliefs." *Id.*; Appellants' Br. p. 66. The Defendants contend that Eisenstein's statements are "nothing more than his own conclusory opinions

which are not supported by any facts or admissible evidence." Appellants' Br. p. 66.

[21] Our review of Eisenstein's affidavit demonstrates that the following portions of the affidavit are factual and based on Eisenstein's personal knowledge: paragraph 32 with the exception of the word "frivolous," paragraph 33, paragraph 34, portions of paragraph 35 (identifying a "dramatic decrease in student enrollment in my courses"), and portions of paragraph 36 ("I have not been allowed to teach summer school or take sabbatical, and I was given a miniscule retroactive raise for the 2011 and 2012 (it was one year and I am not sure which one it was. I filed a grievance against it an [sic] lost) school year."). The word "frivolous" in paragraph 32 and remainder of paragraphs 35, 36, 37, and 38, however, are speculation, opinion, and conclusory statements. The statements are merely Eisenstein's interpretation and opinion rather than facts in his personal knowledge. Consequently, the trial court partially erred when it denied the Defendants' motion to strike.

## II. 42 U.S.C. § 1983 Claims

[22] The Defendants argue that the trial court erred by denying their motion for summary judgment regarding Eisenstein's claims under 42 U.S.C. § 1983. Eisenstein's complaint included three Section 1983 claims—a violation of free speech related to Purdue's Policy and the complaints filed against him, a deprivation of due process related to the Policy and Procedures, and a second violation of free speech related to Chancellor Keon's instruction to remove a

link for Eisenstein's personal blog from his signature block of his Purdue email account.

[23] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "[I]t is first necessary to determine whether a particular defendant is a 'person' within the meaning of the statute and thus, amenable to suit." *Ross v. Indiana State Bd. of Nursing*, 790 N.E.2d 110, 117 (Ind. Ct. App. 2003). Five general rules have emerged regarding whether an entity is a "person" within the meaning of Section 1983:

> 1) a municipality, municipal official, or other local governmental unit or political subdivision may be sued for retrospective or prospective relief; 2) a state or state agency may not be sued under section 1983 regardless of the type of relief requested; 3) a state official cannot be sued in his official capacity for retrospective relief but can be sued for prospective relief; 4) a state official can be sued in his individual capacity for retrospective relief; and 5) an entity with Eleventh Amendment [2]

---

[2] The Eleventh Amendment to the Constitution of the United States provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

> immunity in federal court is not considered a section 1983 "person" in state court.

*Id.* Eisenstein's Section 1983 claims named all of the Defendants, which included Purdue's Board of Trustees and Chancellor Keon and the individual professors in their official and individual capacities.

[24] We first address the parties' arguments regarding the Defendants in their official capacities. The Defendants argue Purdue and the individual Defendants acting in their official capacities have immunity under the Eleventh Amendment.[3] "Under the Eleventh Amendment, a state may not be sued under federal law in either federal or state court without the state's consent or Congress' legitimate abrogation of the state's sovereign immunity." *Gaff v. Indiana-Purdue Univ. of Fort Wayne*, 45 N.E.3d 458, 463 (Ind. Ct. App. 2015), *relevant portion summarily aff'd and vacated in part on other grounds by* 51 N.E.3d 1163 (Ind. 2016). Our courts have held that Purdue University is an arm of the state entitled to sovereign immunity under the Eleventh Amendment. *See id.* Therefore, Purdue cannot be sued in state court for damages for federal constitutional violations. *See id.* (holding that Indiana-Purdue University of Fort Wayne cannot be sued in state court for federal constitutional violations).

---

[3] Eisenstein argues that the Defendants waived any Eleventh Amendment immunity by failing to raise the issue before the trial court. However, the Defendants raised the Eleventh Amendment immunity argument in their motion for summary judgment. *See* Appellants' App. Vol. V pp. 85-89.

Further, "[a]lthough the Eleventh Amendment bars all claims against Purdue and the damages claims against its officials in their official capacities, it does not thwart the claims against the officials in their official capacities for the injunctive relief of reinstatement." *Kashani v. Purdue Univ.*, 813 F.2d 843, 848 (7th Cir. 1987), *cert. denied*; *see also Chang v. Purdue Univ.*, 985 N.E.2d 35, 49 (Ind. Ct. App. 2013) ("[A] state official may be sued in his or her official capacity for prospective relief such as an injunction for a violation of a person's due process rights under § 1983."), *trans. denied*. Eisenstein's Section 1983 claims requested compensatory damages, punitive damages, and attorney fees, not prospective relief to prevent future constitutional violations. *See* Appellants' App. Vol. II pp. 111-12.

Separately, Eisenstein also requested declaratory judgment that he did not violate the Policy and that the Policy is unconstitutional and violates due process and the exercise of free speech. He states that the declaratory judgment request qualifies as injunctive relief, but he fails to elaborate on this proposition or tie the declaratory judgment claim to prospective relief related to his Section 1983 claims. *See* Appellee's Br. p. 27. Although declaratory relief can in certain circumstances qualify as prospective relief where there are continuing violations, *see Green v. Mansour*, 474 U.S. 64, 73, 106 S. Ct. 423, 428 (1985), Eisenstein failed to explain any such continuing violations. The Defendants demonstrated that they were entitled to summary judgment on this issue, and Eisenstein failed to respond with a cogent argument demonstrating otherwise. We conclude that the trial court erred by denying Defendants' motion for

summary judgment regarding Eisenstein's Section 1983 claim against Purdue and the individual Defendants in their official capacities.

[27] We next address whether the Defendants were entitled to summary judgment on Eisenstein's Section 1983 claims against them in their individual capacities.[4] A state official sued in his personal capacity is a "person" under Section 1983 even when money damages are requested. *Severson v. Bd. of Trustees of Purdue Univ.*, 777 N.E.2d 1181, 1194 (Ind. Ct. App. 2002), *trans. denied*; *see also Chang*, 985 N.E.2d at 49 ("[A] state official may be sued in his or her individual capacity for retrospective relief under § 1983."). Defendants argue, however, that: (1) Lerner, Joyce, Tobin, Fewer, and Jackson were not acting under color of state law; (2) the individual Defendants have absolute immunity to the Section 1983 claims; (3) the individual Defendants have qualified immunity; (4) Eisenstein's claims against the individual Defendants fail under the Pickering Balancing Test[5]; and (5) Eisenstein's Section 1983 claims are without merit.

[28] We conclude that the Defendants' absolute immunity argument is dispositive. When a Section 1983 claim is asserted against a state official in his or her

---

[4] Although Eisenstein's complaint alleges these claims against each of the Defendants, some of the allegations plainly do not apply to all of the Defendants. For example, Count VII concerned a Section 1983 claim related to Chancellor Keon's order that Eisenstein remove a link to his personal blog from his university email signature block. This claim clearly has nothing to do with the other professors. Additionally, Count V alleged a Section 1983 violation through the university's enforcement of the Policy and Procedures, which also does not pertain to the other professors. Eisenstein's appellee's brief does not lend clarity to these claims. It is unclear how one Defendant could be held liable for the alleged misconduct of other Defendants.

[5] *See Pickering v. Bd. of Education*, 391 U.S. 563, 88 S. Ct. 1731 (1968).

individual capacity, he or she "may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2nd Cir. 1993). In support of their argument that the Defendants are entitled to absolute immunity in their individual capacities, they rely on our supreme court's opinion in *Hartman v. Keri*, 883 N.E.2d 774 (Ind. 2008). There, graduate students at Indiana University-Purdue University at Fort Wayne ("IPFW") filed complaints with the university alleging sexual harassment by a professor. Pursuant to Purdue's anti-harassment policy and procedures, the same policy at issue here, the chancellor assigned an investigator, who found the complaints credible and recommended that the professor be removed from his teaching responsibilities. The investigator's conclusions were reviewed and approved by a three-person panel and by the chancellor. The professor appealed the decision to the president of Purdue University, who upheld the decision. The professor then filed a complaint against the students for libel, slander, and malicious interference with the professor's employment contract. The trial court denied the students' motion for summary judgment.

[29] On appeal, our supreme court held that the students' statements were protected by absolute privilege. The court noted:

> Indiana law has long recognized an absolute privilege that protects all relevant statements made in the course of a judicial proceeding, regardless of the truth or motive behind the statements. *Wilkins v. Hyde*, 142 Ind. 260, 261, 41 N.E. 536, 536 (1895); *Van Eaton v. Fink*, 697 N.E.2d 490, 494 (Ind. Ct. App. 1998). "The reason upon which the rule is founded is the

necessity of preserving the due administration of justice,"
*Wilkins*, 142 Ind. at 261, 41 N.E. at 536, by providing actors in
judicial proceedings with the freedom to participate without fear
of future defamation claims. *Van Eaton*, 697 N.E.2d at 494
(citing *Briggs v. Clinton County Bank & Trust Co.*, 452 N.E.2d 989,
997 (Ind. Ct. App. 1983)).

Policies similar to Purdue's are commonly found in institutions
of higher education. At least three states have held that
communications to school authorities raising complaints against
educators enjoy the same absolute privilege the law accords to
statements in judicial proceedings. . . . . At least in the context of
educational institutions, as long as the process is reasonably
transparent and fair and affords the subject an opportunity to
respond, we think the ultimate issue focuses less on the particular
process and more on the recognition of the institution's interest
in assuring a proper educational environment.

*Hartman*, 883 N.E.2d at 777-78 (footnote omitted).

[30]    The court noted that the students followed Purdue's established procedures and

"[p]rotecting their complaints with anything less than an absolute privilege

could chill some legitimate complaints for fear of retaliatory litigation." *Id.* at

778.

Other faculty-student disputes would result in traditional
litigation rather than academic resolution to avoid any risk of loss
of the absolute privilege accorded statements in judicial
proceedings. A university should be given the latitude to tailor
its processes to the educational environment without degrading
the protection the law gives to complaints of misconduct in the
educational setting. The facts of this case illustrate the
importance of such a procedure.

*Id.* The court noted that the students were subject to academic discipline for abuse of process, which is a "substantial deterrent to false reporting." *Id.* "Although Purdue's procedure may lack the trappings of a traditional court proceeding, it is orderly and reasonably fair, requires 'appropriate discipline' for those who file knowingly false or malicious complaints, and promises reasonable efforts to restore the reputation of anyone charged with discrimination or harassment that proves unsubstantiated." *Id.* at 778-79. Consequently, our supreme court found that the students' motion for summary judgment should have been granted.

[31]    Defendants argue that they were acting in a quasi-judicial capacity and, thus, under *Hartman*, have absolute immunity from Eisenstein's Section 1983 claims. In response to Defendants' arguments, Eisenstein argues only that *Hartman* is inapplicable because the Defendants are faculty, not students, and that they made "defamatory statements against Eisenstein in their complaints, at Keon's suggestion, that severely damaged Eisenstein's reputation on campus."[6] Appellee's Br. p. 34. Even though the defendants in *Hartman* were students rather than faculty, the same propositions apply here. Like the students, the faculty are subject to discipline for filing knowingly false or malicious complaints. Based on *Hartman*, Lerner, Joyce, Tobin, Fewer, and Jackson, the

---

[6] Eisenstein argues that Purdue's Policy and Procedures are not quasi-judicial and, thus, absolute privilege is inapplicable. However, this argument conflicts with our supreme court's decision in *Hartman*, which applied the absolute privilege.

professors that filed complaints against Eisenstein, are entitled to absolute immunity.

[32] Although Chancellor Keon did not file a complaint under the Policy and Procedures, he is also entitled to absolute immunity here. As Defendants argued in their motion for summary judgment, "[t]he entire process, from the filing of the complaints, to Keon's appointment of an investigator, to the investigation and the reprimand, was conducted as a part of the quasi-judicial process outlined in the Procedures." Appellants' App. Vol. V p. 93. "It is well-settled that judges are entitled to absolute judicial immunity for all actions taken in the judge's judicial capacity, unless those actions are taken in the complete absence of any jurisdiction." *Droscha v. Shepherd*, 931 N.E.2d 882, 888-89 (Ind. Ct. App. 2010). "The underlying purpose of the immunity is to preserve judicial independence in the decision-making process." *Id.* at 889. "The same policies that underlie the grant of absolute judicial immunity to judges justify the grant of immunity to non-judicial officers who perform quasi-judicial functions." *Id.* Chancellor Keon was acting in a quasi-judicial role and is also entitled to absolute immunity. *See, e.g., Gressley v. Deutsch*, 890 F. Supp. 1474, 1491 (D. Wyo. 1994) (holding that the individual members of the Board of Trustees were entitled to quasi-judicial or absolute immunity from damages in a 42 U.S.C. § 1983 action); *Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 522 (7th Cir. 2001) (holding that board members were entitled to absolute immunity to protect them "from harassment and intimidation so that they can exercise their independent judgment), *cert. denied*. We conclude that

the trial court erred by denying the individual Defendants' motion for summary judgment regarding the Section 1983 claims.[7]

### III. 42 U.S.C. § 1985 Claim

[33] Defendants argue that the trial court erred when it denied their motion for summary judgment regarding Eisenstein's claim under 42 U.S.C. § 1985(3). In his complaint, Eisenstein alleged that the Defendants engaged in a conspiracy against him by filing the complaints and finding him in violation of Purdue's Policy.

[34] 42 U.S.C. Section 1985(3) is "a remedial statute that prohibits conspiracies to deprive a person of rights guaranteed by the Constitution or federal laws." *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 641-42 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). It provides:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

---

[7] Eisenstein argues on cross-appeal that Purdue violated his due process rights by "launching an investigation premised entirely on protected speech." Appellee's Br. p. 74. Eisenstein also argues that Chancellor Keon deprived him of his First Amendment rights by ordering him to remove a link to his personal blog from his email signature block. Given our determination that Eisenstein's claims are barred by the Eleventh Amendment and the individual defendants had absolute immunity, we need not address the merits of Eisenstein's claims.

42 U.S.C. § 1985(3).  The courts have identified four elements necessary to make out a valid case under § 1985(3):

> (1) a conspiracy; (2) a purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to his person or property or a deprivation of any right or privilege of a citizen of the United States.

*Keri*, 458 F.3d at 642 (quoting *Quinones v. Szorc*, 771 F.2d 289, 291 n.1 (7th Cir. 1985)).

[35] In their motion for summary judgment, the Defendants argued that they were entitled to summary judgment for the same reasons that they were entitled to summary judgment on the Section 1983 claims.  Purdue and the Defendants in their official capacities are immune from Section 1985(3) damages under the Eleventh Amendment.  *See id.* at 641 (holding that Purdue was immune from the plaintiff's claims for damages under §§ 1981, 1985(3), and 1986 pursuant to the Eleventh Amendment).  The Defendants in their official capacities are not immune for claims of prospective relief.  *Id.*  However, Eisenstein makes no cogent argument that he is requesting prospective relief on his Section 1985(3) claim.  Consequently, the trial court erred by denying the Defendants' motion for summary judgment in their official capacities on this claim.

[36] As for Eisenstein's claim against the Defendants in their individual capacities, the Defendant again argue that they had absolute immunity.  As with a Section 1983 claim, absolute immunity may be asserted in response to a Section 1985(3)

claim. *Williams v. Rappeport*, 699 F. Supp. 501, 506 (D. Md. 1988), *aff'd sub nom. Williams v. Dvoskin*, 879 F.2d 863 (4th Cir. 1989), *cert. denied*. For the same reasons discussed in our analysis of Eisenstein's Section 1983 claims, we agree that the Defendants in their individual capacities are entitled to absolute immunity for their participation in the complaints filed against Eisenstein and the process outlined by the Policy and Procedures. The trial court erred when it denied the Defendants' motion for summary judgment on this issue.

## IV. Concerted Action

[37] Eisenstein alleged in his complaint that Lerner, Joyce, Tobin, Fewer, Jackson, and Chancellor Keon engaged in a "concerted action" to deprive him of his civil rights, damage his professional reputation, and intentionally inflict emotional distress. Appellants' App. Vol. II p. 106. "'A civil conspiracy is a combination of two or more persons who engage in a concerted action to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means.'" *Birge v. Town of Linden*, 57 N.E.3d 839, 845 (Ind. Ct. App. 2016) (quoting *Miller v. Cent. Ind. Cmty. Found.*, 11 N.E.3d 944, 962 (Ind. Ct. App. 2014), *trans. denied*). "Civil conspiracy is not an independent cause of action." *Id.* at 846. Civil conspiracy "must be alleged with an underlying tort." *Id.* "Unlike criminal conspiracy, the gist of a civil conspiracy is not the unlawful agreement, but the damage caused by acts committed in pursuance of the agreement." *Id.* Thus, an allegation of civil conspiracy is "just another way of asserting a concerted action in the commission of a tort." *Id.* In order to state a claim, Eisenstein must demonstrate a "concerted action in the

commission of a tort that resulted in damages." *K.M.K. v. A.K.*, 908 N.E.2d 658, 664 (Ind. Ct. App. 2009), *trans. denied*. "[A]n allegation of civil conspiracy will not survive based only upon impermissible speculation." *Miller*, 11 N.E.3d at 963. If we conclude that summary judgment should have been entered with respect to the underlying torts alleged by Eisenstein, then Eisenstein's concerted action claim would fail. *See id.* at 963. We will address each of the tort allegations raised by Eisenstein separately.

### A. Civil Rights Violation

[38] To the extent Eisenstein contends that the alleged concerted action was based on a deprivation of his civil rights, we note that this claim is essentially duplicative of Eisenstein's Section 1983 and Section 1985 claims. "'[A] 'conspiracy' to violate § 1983 is not a violation of a state statute independent of a § 1983 violation.'" *Id.* (quoting *City of Warsaw v. Orban*, 884 N.E.2d 262, 269 (Ind. Ct. App. 2007), *trans. denied*). We have already held that the trial court erred by denying the Defendants' motion for summary judgment regarding the Section 1983 and Section 1985 claims. Eisenstein makes no argument that this claim is distinct from his Section 1983 or 1985 claims. Consequently, the trial court erred by denying the Defendants' motion for summary judgment regarding Eisenstein's claim of concerted action to deprive him of his civil rights.

## B. Defamation

[39]  Eisenstein also contends that the Defendants engaged in a concerted action to defame him. In his complaint, Eisenstein alleged that Lerner, Joyce, Tobin, Fewer, Jackson, and Chancellor Keon damaged his professional reputation "by making false and unfounded allegations of harassment and inappropriate teaching methodologies against him." Appellants' App. Vol. II p. 106.

[40]  "Defamation is 'that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff.'" *Miller*, 11 N.E.3d at 955 (quoting *Davidson v. Perron*, 716 N.E.2d 29, 37 (Ind. Ct. App. 1999), *trans. denied*). To establish defamation, a plaintiff must prove the following elements: (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. *Id.* at 955-56. A plaintiff who sues for defamation must set out the alleged defamatory statement in his complaint. *Id.*

> There is sound reason for this policy, as the absence of a statement in the complaint works a detriment on both the court and the defendant. The court is handicapped without the statement since, without it, the court cannot actually determine if the statement is legally defamatory. *Journal-Gazette Co. v. Bandido's Inc.*, 712 N.E.2d 446, 457 (Ind. 1999). The defendant is placed on an unfair footing since the absence of the statement denies [him] the opportunity to prepare appropriate defenses.

*Miller*, 11 N.E.3d at 956 (quoting *Trail v. Boys & Girls Clubs of Nw. Indiana*, 845 N.E.2d 130, 137 (Ind. 2006)). "When specific statements that are alleged to be

defamatory have not been sufficiently identified in a plaintiff's complaint, an award of summary judgment for the defendant is proper." *Id.*

[41] On appeal, the Defendants contend, in part, that Eisenstein has failed to identify in his complaint the allegedly defamatory statements made by them. We agree. The complaint's vague allegations about the Defendants' conduct are insufficient to support a defamation claim. The complaint fails to specifically identify the allegedly defamatory statements and fails to tie any statement to the individual Defendants. The trial court erred by denying the Defendants' motion for summary judgment on this basis.

[42] Alternatively, Defendants argue that the trial court erred by denying their motion for summary judgment regarding Eisenstein's defamation claim because the Defendants' actions were protected by absolute privilege. Absolute privilege is a defense to a defamation action. *See Hartman*, 883 N.E.2d at 777-79 (granting summary judgment to students in a professor's defamation action based on absolute privilege where the students had lodged complaints with the university pursuant to the university's anti-harassment policy). "An absolute privilege bars an action for defamation even when the information was false, and was maliciously and knowingly published." *Hoffman v. Roberto*, 578 N.E.2d 701, 710 (Ind. Ct. App. 1991), *trans. denied*. In his Appellee's Brief, Eisenstein vaguely identifies allegedly defamatory statements made in the complaints against him to Purdue. *See* Appellee's Br. pp. 53-57. We have determined that the Defendants' statements in their complaints to the university regarding Eisenstein are protected by absolute privilege in the context of Eisenstein's

Section 1983 and 1985 claims. Likewise, the Defendants' statements in their complaints are protected by absolute privilege in the context of Eisenstein's defamation claim.

### C. Intentional Infliction of Emotional Distress

[43] Next, the Defendants argue that the trial court erred by denying their motion for summary judgment regarding Eisenstein's claim of conspiracy to commit intentional infliction of emotional distress. Eisenstein alleged in his complaint that the individual Defendants "engaged in a concerted action to intentionally inflict emotional distress on [him]." Appellants' App. Vol. II p. 106. Eisenstein alleged that their conduct was "extreme and outrageous" and that he suffered damages as a result. *Id.* at 107.

[44] "Intentional infliction of emotional distress is committed by 'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another. . . .'" *Miller*, 11 N.E.3d at 959 (quoting *Ledbetter v. Ross*, 725 N.E.2d 120, 123-24 (Ind. Ct. App. 2000)). "The intent to harm emotionally constitutes the basis of the tort." *Id.* The elements of intentional infliction of emotional distress are that a defendant (1) engages in extreme and outrageous conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another. *Id.* at 959-60. "The requirements to prove this tort are 'rigorous.'" *Id.* at 960 (quoting *Ledbetter*, 725 N.E.2d at 124). "Intentional infliction of emotional distress is found where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind." *Id.* "Liability has been found only where the conduct has

been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Bradley v. Hall*, 720 N.E.2d 747, 752-53 (Ind. Ct. App. 1999)). In the appropriate case, an intentional infliction of emotional distress claim may be disposed of by summary judgment. *See, e.g., id.* (affirming the trial court's grant of summary judgment on the plaintiff's intentional infliction of emotional distress claim); *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (holding that the trial court properly granted summary judgment on the plaintiff's intentional infliction of emotional distress claim).

[45] In support of his argument, Eisenstein contends that "Keon, Joyce, Jackson, Lerner, Tobin, Fewer, and their co-conspirators have engaged in long-term surveillance, harassment, and disparagement of Eisenstein over a period of over four years." Appellee's Br. p. 59. Eisenstein argues that the Defendants "stoked racial tensions on Purdue's campus in an effort to have his employment terminated" and that they "encouraged the formation of a large clandestine Facebook group through which the Defendants and their co-conspirators discussed strategies for having Eisenstein terminated, monitored his Facebook and blog posts, and exchanged 'evidence' for dissemination across campus, such as the misleadingly edited recording of his lectures." *Id.* at 59-60. Finally, Eisenstein argues that the Defendants encouraged student and co-conspirators to file frivolous complaints against him with the university. Eisenstein argues that Chancellor Keon was aware that the complaints were frivolous but

"subjected him to a frivolous investigation, and even ordered the issuance of the formal reprimands for speech that was not sanctionable." *Id.* at 60.

[46] The fact that the Defendants filed complaints pursuant to the Policy and Procedures after Eisenstein's offensive statements is not "extreme and outrageous conduct" that would support an intentional infliction of emotional distress claim. *Miller*, 11 N.E.3d at 960. Further, the fact that some of the Defendants were part of a private Facebook group, read Eisenstein's public Facebook and blog posts, discussed Eisenstein's conduct among themselves and others, or sent letters to other organizations regarding Eisenstein's conduct is similarly not the extreme and outrageous conduct required to support such a claim. Finally, the fact that Chancellor Keon ordered an investigation of the complaints, as required by the Procedures, simply is not extreme and outrageous. Eisenstein seeks to treat all contact between faculty members, between students, and between faculty and students regarding his behavior as a conspiracy against him. Eisenstein must show, however, that the Defendants were trying to "accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means." *Birge*, 57 N.E.3d at 845. Eisenstein has failed to demonstrate such an unlawful purpose or unlawful means.[8] The designated evidence simply does not support a determination that the Defendants

---

[8] Eisenstein contends in his cross-appeal that he is entitled to summary judgment because "there is absolutely no dispute of fact that Defendants engaged in a conspiracy against [him] to deprive [him] of his civil rights in violation of § 1983 and § 1985(3), and to commit the torts of defamation and IIED." Appellee's Br. p. 72. Because Eisenstein fails to demonstrate an unlawful purpose or unlawful means, the trial court properly denied his cross-motion for summary judgment.

conspired to intentionally inflicted emotional distress on Eisenstein. The trial court erred by denying the Defendants' motion for summary judgment on this claim.

### V. Breach of Contract

[47] The Defendants argue that the trial court erred by denying their motion for summary judgment regarding Eisenstein's breach of contract claim. In his complaint, Eisenstein alleged that Purdue breached its employment contract with him by finding that he committed retaliation and by failing to dismiss the retaliation complaint filed by Joyce and Lerner. Eisenstein alleged that Chancellor Keon violated Purdue's Policies and Procedures by releasing his determination to "some of the Defendants and others" and that Joyce violated Purdue's policies by disclosing confidential documents. Appellants' App. Vol. II p. 108. On appeal, Eisenstein contends that the Defendants breached his employment contract by failing to follow the Policy and Procedures in many ways.

[48] Although Eisenstein's claim is against all of the Defendants, *see* Appellants' App. Vol. II p. 107, he does not explain how Lerner, Joyce, Tobin, Fewer, and Jackson could have breached an employment contract that he had with Purdue. "Generally, only a party to the contract can be held liable for its breach because contractual obligations are personal in nature." *Rodriguez v. Tech Credit Union Corp.*, 824 N.E.2d 442, 447 (Ind. Ct. App. 2005). These parties were entitled to summary judgment on Eisenstein's breach of contract claim.

As for the remaining Defendants, they argue on appeal, in part, that they are entitled to summary judgment on the breach of employment agreement claim because the Policy and Procedures relied upon by Eisenstein are not a part of his employment contract. Eisenstein argues that he executed Purdue's Form 19, which provides:

> The individual named above is hereby appointed to the faculty of Purdue University for the limited term stated above, and hereby accepts such appointment of the terms and conductions provided herein and in Executive Memorandum No. B-50 (Terms and Conditions of Employment of Faculty members), or succeeding documents, which by this reference is made part of this Agreement. . . . . The undersigned appointee understands that it is his/her responsibility to become acquainted with those Executive memoranda and University policies which are related to Purdue employment, including but not limited to, B-4, I.A.1, B-48, and the Faculty and Staff Handbook.

Appellee's App. Vol. IV p. 38. Eisenstein contends that this provision means that "both Purdue and Eisenstein mutually intended to be bound by all of Purdue's policies that relate to his employment . . . ." Appellee's Br. p. 63.

Form 19 merely states that the faculty member should become "acquainted with" the Faculty and Staff Handbook. Appellee's App. Vol. IV p. 38. It does not incorporate the Faculty and Staff Handbook into the employment contract. Further, the preamble of the Faculty and Staff Handbook states that the Handbook "does not create an express or implied contract or guarantee

employment for any term." Appellants' App. Vol. V p. 149. The Policy and Procedures are incorporated into this Handbook.[9]

[51] The Southern District of Indiana and the Seventh Circuit addressed a similar argument in *Packer v. Trustees of Indiana Univ. Sch. of Med.*, 73 F.Supp.3d 1030 (S.D. Ind. 2014), *affirmed by Packer v. Trustees of Indiana Univ. Sch. of Med.*, 800 F.3d 843 (7th Cir. 2015). There, a professor brought a breach of contract claim against a university based on her tenure status. The tenure policies that she relied upon were part of the university's Academic Handbook. However, the preamble of the Handbook stated that it did not create a contract and did not create any legal rights. The Southern District of Indiana held that "[b]ecause the Academic Handbook explicitly disclaims any creation of a contract, [the professor] cannot rely upon these policies as a basis for her breach of contract claim." *Packer*, 73 F.Supp.3d at 1041. Consequently, the court found that the university was entitled to summary judgment on the breach of contract claim. On appeal, the Seventh Circuit agreed, concluding that her breach of contract claim was "wholly unsupported" and that the district court properly disposed of the claim on summary judgment. *Packer*, 800 F.3d at 852.

---

[9] Eisenstein argues that the Policy and Procedures are not part of the Handbook because the online Handbook only contains brief summaries of the university policies with links to the policies. Eisenstein relies only on printouts from the website. Defendants designated evidence from the Purdue University Interim Vice President of Human Resources that the Policy and Procedures are incorporated in the Handbook. *See* Appellants' App. Vol. V pp. 146-47. Given the evidence designated by the Defendants and Eisenstein's failure to designate relevant evidence in support of his claim, we conclude that the Policy and Procedures are part of the Handbook.

Likewise, here, Eisenstein's employment contract only suggests that he become acquainted with the Handbook. The Handbook specifically provides that it "does not create an express or implied contract or guarantee employment for any term." Appellants' App. Vol. V p. 149. Indiana courts have long held that employee handbooks that contain such disclaimers do not create a contract for employment. *See Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712, 721 (Ind. 1997). The Policy and Procedures were not part of Eisenstein's employment contract, and Eisenstein cannot rely on them to support a breach of contract claim. The trial court erred by denying the Defendants' motion for summary judgment regarding Eisenstein's breach of contract claim.

## VI. Declaratory Relief

Finally, the Defendants argue that the trial court erred by denying their motion for summary judgment on Eisenstein's declaratory relief claim. In his complaint, Eisenstein sought a judicial determination that he did not violate the Policy by engaging in retaliation, that the Policy is "void for vagueness," that his conduct was "free speech and therefore the Policy is unconstitutional as applied to" him, and that "Purdue's policy is unconstitutional and violates Due Process and Freedom of Speech under the state and federal constitutions." Appellants' App. Vol. II p. 105.

In their motion for summary judgment, the Defendants argued that they were entitled to summary judgment because: (1) Eisenstein's petition for judicial determination had already been dismissed; (2) Eisenstein lacked standing to challenge the Policy; (3) the Policy provisions are not vague; and (4) Chancellor

Keon was entitled to qualified immunity. In response, Eisenstein argued that: (1) his statements did not amount to retaliation; (2) the Policy is unconstitutionally vague and overbroad; (3) he was seeking a declaratory judgment not judicial review; and (4) Chancellor Keon was not entitled to qualified immunity. On appeal, the Defendants argue only that Eisenstein does not have standing to challenge the Policy and Procedures and that the Policy and Procedures are not unconstitutionally vague or overbroad.

[55] "The doctrine of standing focuses on whether the complaining party is the proper person to invoke the Court's power." *Barnette v. U.S. Architects, LLP*, 15 N.E.3d 1, 11 (Ind. Ct. App. 2014). "The standing requirement restrains the judiciary to resolving only those controversies in which the complaining party has a demonstrable injury." *Id.* "In order to establish standing, a plaintiff must show that he or she has sustained, or was in immediate danger of sustaining, some direct injury as a result of the conduct at issue." *Id.* Because Eisenstein was reprimanded based only on the retaliation provisions, he has standing to challenge that provision only.

[56] Next, Defendants argue that Eisenstein did not have standing to challenge the retaliation policy based on vagueness grounds because his behavior was "so clearly retaliatory that it is obvious the Policy and Procedures would apply to him." Appellants' Br. p. 62. Defendants contend that "'[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness.'" *Bird v. County of Allen*, 639 N.E.2d 320, 332 (Ind. Ct. App. 1994) (quoting *Parker v. Levy*, 417 U.S. 733, 756, 94 S. Ct. 2547, 2562 (1974)).

[57]     The Policy provided that "Retaliation against faculty members, staff members or students for reporting or complaining of Harassment, for assisting or participating in the investigation of a complaint of Harassment, or for enforcing this policy is strictly prohibited." Appellants' App. Vol. VII p. 159. Retaliation was defined as "Any overt or covert act of reprisal, interference, restraint, penalty, discrimination, intimidation or harassment against any person or group for exercising rights under this policy." *Id.* at 162. Further, the Procedures provided:

> Retaliation against any person for reporting or complaining of discrimination and/or harassment, assisting or participating in the investigation of a complaint of discrimination and/or harassment, or enforcing University policies with respect to discrimination and/or harassment is strictly prohibited. Overt or covert acts of reprisal, interference, restraint, penalty, discrimination, intimidation or harassment against an individual or group for exercising rights or performing duties under these Procedures will be subject to appropriate and prompt disciplinary or remedial action.

*Id.* at 172. Eisenstein's retaliatory conduct involved telling Joyce, "Now I know why your son committed suicide," after she had filed a complaint against him pursuant to the Policy and Procedures. Appellants' App. Vol. VI p. 178. As for Lerner, after Lerner filed his complaint, Eisenstein sent him and others an email that stated: "My mother cursed [Lerner] before her death (a true orthodox curse). He knows why. Therefore, there will be no association with him. I consider anything from him to be in and of itself cursed and therefore untouchable." Appellants' App. Vol. III p. 89.

[58] Although he denies making the statement to Joyce, Eisenstein characterizes his statements as "minor work place slight[s]" and an expression of free speech. Appellants' App. Vol. VI p. 41. Eisenstein argued that he was "entitled to express his disapproval to Joyce because she perpetuated an injustice against him and threatened his employment by joining the defendants' conspiracy." *Id.* at 42. Similarly, he argued that he was "certainly entitled to respond with anger toward Lerner's final decision to harm Eisenstein alongside their colleagues." *Id.* at 43. He conceded in his summary judgment memorandum that "insulting someone over the suicide of their child is certainly taboo" and that Lerner's allegations make Eisenstein appear to be "a mean-spirited bully, who attacked a close friend of his parents with a very demeaning insult." *Id.* at 124-25. It is clear from Eisenstein's arguments that the statements were overt acts made to harass Joyce and Lerner for filing their complaints. We conclude that Eisenstein's conduct "falls within the narrow category of acts so egregious that, despite any protestations to the contrary, he would have had no doubt that they were proscribed." *Bird*, 639 N.E.2d at 332 (quoting *Aiello v. City of Wilmington*, 426 F.Supp. 1272, 1292-93 (D.Del. 1976)).

[59] Next, Defendants argue that the retaliation provisions are not vague. The policy could be "void for vagueness only if it is vague as applied to the precise circumstances of the instant case." *Parks v. Madison County*, 783 N.E.2d 711, 722 (Ind. Ct. App. 2002), *trans. denied*. A provision "is not void for vagueness if individuals of ordinary intelligence could comprehend it to the extent that it would fairly inform them of the generally proscribed conduct." *Pittman v. State*,

45 N.E.3d 805, 816 (Ind. Ct. App. 2015). Eisenstein argues that the provisions are void for vagueness because they fail to "provide notice of the conduct proscribed and allow[] for discriminatory enforcement by failing to provide standards governing its enforcement." Appellee's Br. p. 68. According to Eisenstein, the provisions lack "standards limiting the discretion of the administrators applying its policies in a way that respects the mandates of the First Amendment." *Id.* at 69. The Policy and Procedures barred overt acts of reprisal and harassment against faculty members for exercising their rights to file complaints. The meaning of the retaliation provisions is such that individuals of ordinary intelligence could comprehend them to the extent that they would fairly inform people of the generally proscribed conduct. We conclude that the language is not vague.

[60] Next, Defendants argue that the Policy is not overbroad. The overbreadth doctrine is "'designed to protect innocent persons from having the legitimate exercise of their constitutionally protected freedoms fall within the ambit of a statute written more broadly than needed to proscribe illegitimate and unprotected conduct.'" *Parks*, 783 N.E.2d at 723 (quoting *Matheney v. State*, 688 N.E.2d 883, 905 (Ind. 1997), *cert. denied*). Eisenstein argues that the provisions are overbroad because they threaten "to punish individuals for any speech between a complainant and the respondent that may be offensive, no matter how trivial, regardless of the merits of the complaints, and even if the speech occurs outside of work." *Id.* at 70-71. We find nothing to indicate that the retaliation provisions were written more broadly than needed to proscribe

illegitimate and unprotected conduct.  Eisenstein seems to argue that anything he said to Lerner or Joyce should be protected by the First Amendment.  The Policy specifically provides that it does not apply to speech or conduct protected by the First Amendment.  The conduct here was clearly retaliatory, and Eisenstein admits that it was in response to the complaints.  The provisions are not overbroad.  The trial court erred by denying the Defendants' motion for summary judgment on this claim.  *See, e.g., Corlett v. Oakland Univ. Bd. of Trustees*, 958 F.Supp.2d 795, 811 (E.D. Mich. 2013) (dismissing a student's claim that the university's harassment policy was overbroad and vague).

## Conclusion

[61]     We conclude that the trial court erred by denying the Defendants' motion for summary judgment and that the trial court properly denied Eisenstein's motion for summary judgment.  We affirm in part and reverse in part.

[62]     Affirmed in part and reversed in part.


May, J., and Bradford, J., concur.